**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Terry E. MOYER, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 6, 2007.

Filed Aug. 1, 2008.

pants to receive counsel fees (7).

660

Michelle H. Sibert, Asst. Dist. Atty., for Com., appellant.

Stephen O. Fugett, Carlisle, for appellee.

BEFORE: FORD ELLIOTT, P.J., MUSMANNO, ORIE MELVIN, LALLY-GREEN, TODD,* BOWES, GANTMAN, McCAFFERY** and DANIELS,*** JJ.

OPINION BY BOWES, J.:

¶ 1 The Commonwealth appeals[1] from the January 24, 2006 order suppressing evidence seized following a traffic stop. As we conclude that Appellee, Terry E. Moyer, was subjected to an investigatory detention that was not supported by reasonable suspicion, we affirm.

¶ 2 At approximately 11:20 p.m. on June 28, 2005, then-Corporal Jonathan Mays of the Pennsylvania State Police was patrolling on Mill Street in South Middleton Township, Cumberland County. Both he and Trooper Elmer Hertzog were in full uniform in a marked cruiser. Officer Mays observed Appellee's vehicle, which had "one tail light" with "a hole in it, and it was exposing white light to the rear, a good amount of white light to the rear." N.T. Suppression, 1/23/06, at 7. Officer Mays initiated a traffic stop by activating his emergency lights, and Appellee pulled his vehicle over to the berm. Since it was night, the police officer positioned a bright spot light from atop the cruiser so as to "light the interior of [Appellee's] vehicle" to ensure that he could safely approach it. *Id.* at 8. At that time, Officer Mays observed "a lot of movement between the driver and the passenger, it was all focused down towards the floor boards and toward the passenger side of the vehicle." *Id.*

¶ 3 When Officer Mays approached Appellee's vehicle, he informed Appellee about the reason for the stop and requested a driver's license and registration card. After Appellee provided the documentation, Officer Mays started inquiring about his destination. Appellee responded that he had come from and was returning to Carlisle, Pennsylvania. When pressed for more details, Appellee stated that he had stopped at the Sheetz store in Mount Holly. Since Appellee appeared nervous and displayed bloodshot eyes, Officer Mays initiated a search for his criminal history, and that "inquiry showed that there was a fingerprint at one time for Act 64, some kind of encounter with Act 64."[2] *Id.* at 10. Officer Mays discovered that Appellee's encounter with that act consisted of an

---

* Judge Todd did not participate in the consideration or decision of this case.

** Judge McCaffery did not participate in the consideration or decision of this case.

*** Judge Daniels did not participate in the consideration or decision of this case.

1. In an affidavit attached to the notice of appeal, the Commonwealth certified in good faith that the order in question will terminate or substantially handicap its prosecution of Appellee. Hence, we have jurisdiction over this appeal. *See Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985); Pa.R.A.P. 311(d).

2. Act 64 refers to The Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. §§ 780–101, *et seq.*

arrest for marijuana possession. *Id.* at 11, 24.

¶ 4 Officer Mays prepared a warning regarding the taillight, returned to the vehicle, ordered Appellee to exit the vehicle, and directed him to the rear of the car. Officer Mays showed him the hole in the taillight, told him to repair it, and gave him a warning card. Trooper Hertzog was standing beside Officer Mays at the rear of the car, and both were armed. At that point, Appellee was instructed that he was free to leave, but as Appellee reached the driver's door of his vehicle, Officer Mays called "his name out" and "asked if he mind[ed]" if the officer asked him a few questions. *Id.* at 10–11. Officer Mays did not inform Appellee that he did not have to answer the questions. *Id.* at 28.

¶ 5 After Appellee agreed to respond, Officer Mays revealed that he was aware of Appellee's "arrest for Act 64 in the past" and had observed the movements in the car after the traffic stop. *Id.* at 11. He then asked Appellee if there were any drugs or paraphernalia in the car. After Appellee responded negatively, Officer Mays continued questioning Appellee as to whether he had any controlled substances or paraphernalia on his person. Appellee denied possessing anything on his person. Then, Officer Mays "asked him if [he] could check his vehicle to make sure that was the case." *Id.* at 11. Appellee, who was not told that he could refuse that request, *id.* at 34, consented to the search of both his person and his vehicle.

¶ 6 A crack pipe was discovered on Appellee's person and another crack pipe was located in the car. Appellee then admitted to Trooper Hertzog that he had recently smoked crack cocaine. He was arrested and transported to Carlisle Hospital to have his blood drawn, which tested positively for the presence of cocaine. Appellee was given his *Miranda* warnings for the first time at the booking center for his DUI charge. *Id.* at 56.

¶ 7 On August 3, 2005, Appellee was charged with one count each of possession of drug paraphernalia and driving under the influence of a controlled substance. Appellee filed an omnibus pretrial motion to suppress all evidence seized as a result of the traffic stop. At the suppression hearing on January 23, 2006, the Commonwealth presented Troopers Mays and Hertzog, who testified to the facts as delineated above.

¶ 8 Appellee, who has an eighth-grade education and left school at the age of sixteen, took the stand and conceded that after Officer Mays returned his documentation, the officer informed him that he was free to leave. Appellee testified, however, that he did not believe he had any choice except to answer questions after Officer Mays re-initiated contact and that he felt similarly compelled to consent to the search of his person and his vehicle.

¶ 9 Based on these facts, the suppression court concluded that Appellee had been subjected to an investigatory detention when Officer Mays asked him if he would answer some questions after returning Appellee's paperwork. The court credited Appellee's testimony that he did not feel free to leave despite Officer Mays's statement to the contrary. The court concluded that Appellee's beliefs were objectively reasonable given all of the circumstances surrounding the interdiction, including the late hour, the isolated and dark rural road, and the bright spotlight shining on Appellee's car. The court also considered the fact that Appellee had been ordered to exit his car, two armed police officers were outside of their cruiser to speak with Appellee, and Appellee was subjected to questioning before re-entering his car and immediately after being informed that he was free to leave. Appellee was never told

that he was not required to answer the questions, nor was he informed that he did not have to consent to the search. Since the detention was not supported by reasonable suspicion, the trial court suppressed the two crack pipes found as a result of the search of Appellee's vehicle and person as well as Appellee's confession to the use of crack cocaine and the results of his blood test. This appeal by the Commonwealth ensued.

 ¶ 10 A panel of this Court affirmed the suppression order, with Judge, now Justice, McCaffery dissenting. We then granted *en banc* review, and the matter is now ready for disposition. Initially, we note:

> When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. *Commonwealth v. Davis,* 491 Pa. 363, 421 A.2d 179 (1980). [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 842 (2003) (citations omitted). However, where the appeal of the determination of the suppression court turns on allegations of legal error, "the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts."

*Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879, 881 (1998).

*Commonwealth v. Mistler,* 590 Pa. 390, 396–97, 912 A.2d 1265, 1269–70 (2006). The Commonwealth argues that after police returned Appellee's documents and told him that he was free to leave, the traffic stop was concluded. It maintains that when Officer Mays re-initiated contact with Appellee, Officer Mays engaged Appellee in a mere encounter that did not need to be supported by reasonable suspicion.

> This Court has noted that there are three basic categories of interactions between citizens and the police. The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio*[, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] and its progeny: such a detention is lawful if supported by reasonable suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Smith,* 575 Pa. 203, 212–13, 836 A.2d 5, 10 (2003); *see also Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (citation omitted) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, ... the encounter is consensual and no reasonable suspicion is required."); *accord*

*Muehler v. Mena,* 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).

¶ 11 In the present case, there is no question that Appellee was subjected to a constitutional seizure when police stopped his vehicle for a taillight infraction. We must therefore decide whether, when Officer Mays reintroduced questioning after returning Appellee's documents and telling him he was free to leave, the subsequent police contact constituted a mere encounter. In making this determination, we are called upon to apply our Supreme Court's simultaneously-issued pronouncements in *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000), and *Commonwealth v. Freeman,* 563 Pa. 82, 757 A.2d 903 (2000), which analyze whether a mere encounter occurs once the reason for a traffic stop has concluded and police re-initiate contact with the defendant.

¶ 12 The following facts informed the *Strickler* decision. Late one night, a police officer observed two men standing on the side of a rural road next to their parked car. The officer stopped to ascertain whether they needed assistance. As he passed the vehicle, the officer noticed that it contained a cooler with unopened beer cans. In response to the officer's questions, the men stated that they were leaving a local racetrack and had stopped to urinate. The officer asked for a driver's license, which the two men supplied.

¶ 13 As the first officer was checking whether the individuals had outstanding warrants, another officer arrived in a second car and parked. The first officer returned the men's licenses and admonished them against urinating on a stranger's property. The officer started to walk toward his cruiser, turned around, and without the existence of any suspicion of criminal activity, asked Strickler if his car contained anything illegal. Strickler responded negatively, and the officer asked

if he could search the car. After Strickler hesitated, the officer informed Strickler that he did not have to give his consent to search. Strickler nevertheless consented, and the officer discovered drug paraphernalia.

¶ 14 As the Commonwealth had readily conceded that there were no facts to support a reasonable suspicion that Strickler was engaged in criminal activity, the sole question presented to the Supreme Court was whether Strickler had been subjected to a seizure within the meaning of the Constitution when, after returning Strickler's documents, the police started to ask questions. The Court observed:

To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. *See [United States v.] Mendenhall,* 446 U.S. [544,] 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 [ (1980) ]; *[Florida v.] Royer,* 460 U.S. [491,] 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 [ (1983) ]. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. *See Mendenhall,* 446 U.S. at 553, 100 S.Ct. 1870. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Id.* at 59–60, 757 A.2d at 890–91 (footnotes omitted); *accord Florida v. Bostick, supra* at 439, 111 S.Ct. 2382 ("We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to de-

termine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."). The *Strickler* Court noted that by its nature, this test is imprecise since it is "designed to assess the coercive effect of police conduct, taken as a whole rather than focus on particular details of that conduct in isolation." *Id.* at 59, 757 A.2d at 890.

¶ 15 Strickler acknowledged that his initial detention was valid but contended that once his license was returned, there was a second detention that was not supported by reasonable suspicion, rendering his consent to search his vehicle infirm. The suppression court in *Strickler* had ruled that once a valid detention had been concluded, it was improper for police to continue an investigative interaction with a citizen. Thus, the suppression court essentially ruled that a detention could never devolve into a mere encounter. Our Supreme Court disagreed and noted that such an approach failed to take into consideration the fact that the officer had informed Strickler he did not have to consent to the search and that there was an absence of any show of authority on the part of the officer.

■ ¶ 16 The Supreme Court ruled that after an initial valid detention has concluded, the crucial determination of whether a continuing interdiction constitutes a mere encounter or a constitutional seizure centers upon whether an individual would objectively believe that he was free to end the encounter and refuse a request to answer questions or conduct a search. In making this determination, we must examine the totality of the circumstances surrounding the interaction between the police and the citizen. A non-exclusive list of factors to be used in assessing whether police conducted a mere encounter after completion of a traffic stop includes: 1) the presence or absence of police excesses; 2) whether there was physical contact; 3) whether police directed the citizen's movements; 4) police demeanor and manner of expression; 5) the location of the interdiction; 6) the content of the questions and statements; 7) the existence and character of the initial investigative detention, including its degree of coerciveness; 8) "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, ... thus suggesting to a citizen that his movements may remain subject to police restraint," *id.*; 9) the "presence of an express admonition to the effect that the citizen-subject is free to depart is a potent, objective factor;" and 10) whether the citizen has been informed that he is not required to consent to the search. *Id.* at 74–75, 757 A.2d at 898–899.

¶ 17 The Court made a critical observation: when an individual has been subjected to a valid detention and the police continue to engage that person in conversation, the citizen, having been in official detention, is **less likely** to understand that he has the right to refuse to answer questions or a search. Furthermore, while acknowledging the importance of the ninth factor, the Court stressed that "conferral of the 'free-to-go' advice is, itself not a reason to forego a totality assessment" and therefore does not constitute a controlling factor in assessing whether a person would actually credit a police indication that he was free to leave. *Id.* at 75 n. 24, 757 A.2d at 899 n. 24.

¶ 18 The *Strickler* Court held that the defendant therein had not been subjected to a seizure after his documentation was returned. The Court noted that the defendant had not been seized initially by police since he voluntarily had stopped and exited his car to urinate. Further, it opined

that the police were not coercive, did not display guns, and had told the defendant that he was free to refuse a search of his vehicle. Police had not directed the defendant to move, did not use coercive language or tone, and there was a clear ending to the first interaction when police returned the defendant's documents. Finally, the Court observed that the isolated location and time of night militated in favor of a finding that the defendant had been seized, but it concluded that those two factors did not outweigh those in favor of a finding that the interdiction was a mere encounter. It held that Strickler was not seized when he granted his permission to search the car, and thus, his consent to search was voluntary.

¶ 19 On the same day of the opinion in *Strickler*, the Supreme Court issued its decision in *Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903 (2000). In that case, the state police noticed two vehicles on an interstate highway traveling together. The two automobiles closely followed one another and were switching lanes simultaneously. A different police cruiser stopped each vehicle. One officer asked Freeman, a driver who was traveling with two passengers, if she was lost or having a problem with the driver of the other car. Freeman responded that she had switched lanes because she was in the wrong lane to continue onto her proper destination and that she was not traveling with the other car. The trooper asked for her driver's license and vehicle registration, returned to his cruiser, and initiated a check on the documents. At that time, he was radioed by the trooper who had stopped the other vehicle and informed that the driver said he was following Freeman's car because it was experiencing difficulties.

¶ 20 The trooper re-approached Freeman's car, gave her a warning for improperly changing lanes, returned her docu-

ments, and stated that she was free to leave. The trooper walked away, but Freeman's car remained stopped. The trooper then returned to Freeman's vehicle and asked her again whether she was traveling with the other car. After she repeated a negative response, the trooper indicated that the occupants of the other vehicle had contradicted that information. He ordered her from her car and asked to search it. Freeman gave permission, and contraband was discovered.

¶ 21 Our Supreme Court suppressed the fruits of that search, concluding that police had initiated a seizure when they re-approached Freeman's car and ordered her to exit it. The Court reasoned that a seizure had occurred despite conferral of the "free to go" language because the "trooper's subsequent actions were inconsistent with his statement to Freeman that she was free to leave." *Id.* at 90, 757 A.2d at 907. Police conduct supporting a determination that Freeman objectively and reasonably believed she was, in fact, not free to go included: 1) the officer returned to Freeman's vehicle and asked her about the second car; 2) he pointed out the discrepancies between her statements and those of the other driver; and 3) "most significantly," the officer "asked her to step out of the vehicle prior to the request for consent [to search]." *Id.* Since the consent to search was vitiated by a detention that was not supported by reasonable suspicion, the Court suppressed the fruits of that search.

¶ 22 In the present case, many factors establish the existence of a coercive environment supporting: 1) the reasonableness of Appellee's belief that he actually was not free to re-enter his car and drive away, and 2) his conclusion that he could not decline the officer's requests for more information and to search his car and person. We first examine the nature of the

prior seizure. Unlike the defendant in *Strickler*, Appellee herein had been subjected to a traffic stop. Despite this fact, Appellee was asked his origination as well as his destination; after his answer was not sufficiently detailed, police requested more precise information. Police directed Appellee to exit his car and then walk to its rear, even though the existence of a hole in his taillight could readily have been addressed while Appellee remained in his vehicle. In this regard, we must stress that Appellee was not ordered from his vehicle based on Officer Mays's concern for his own safety. Thus, police herein directly controlled Appellee's freedom of action after initiating the stop and conducting questioning as if he had engaged in suspicious activity. These facts support the existence of an intimidating atmosphere because police demands that Appellee justify his whereabouts and exit his car were excessive under the circumstances leading to the stop.[3]

¶ 23 In addition, the reintroduction of questioning occurred within seconds after the admonition that Appellee could leave the scene, rendering the interdiction virtually seamless. The record establishes that Appellee walked from the rear of the car to his car door when he was stopped again. *See* N.T. Suppression, 1/23/06, at 10 (when Appellee got "to the door of his vehicle," Officer Mays called "his name out" and asked if he minded answering some ques-

tions).[4] Officer Mays conceded that this distance was a matter of "6 or 7" steps and the lapse of time seconds. *Id.* at 26. Thus, there was no precise end to the traffic stop, which also supports a finding that Appellee reasonably believed he remained subject to a police seizure.

¶ 24 Furthermore, other coercive features were present in this case. There were two armed, uniformed police standing near Appellee, who was alone and isolated outside his car when he was asked if he would answer questions. Police had activated both their red and blue flashing lights and a bright white police spotlight, which was directed at the car. *Id.* at 7, 22. Appellee was not informed that he did not have to answer any further questions. Officer Mays conveyed to Appellee the results of his criminal history check, accusing him of past drug activity despite the fact that the disposition of Appellee's prior arrest was unknown. Appellee then was asked if there were controlled substances or paraphernalia in his car or on his person.

¶ 25 The geographical, temporal, and environmental elements associated with the interdiction do not support the Commonwealth's position that the request for further information was a mere encounter. It was late at night on a rural, unlit road. As the Supreme Court observed in *Strickler*, the fact that a defendant is asked to an-

---

**3.** We acknowledge the officer's authority to question Appellee about his origination and destination and are fully aware that it was well within the officer's authority to order a defendant to alight from the car, *see Freeman, supra* at 907 n. 4. However, the Court in *Strickler* has instructed us to consider whether the police directed the citizen's movements, the nature of questioning and police excesses when we analyze whether a defendant would feel free to go under the circumstances. Thus, we are not implying that the police were prohibited from engaging in this behavior but merely are gauging its particular

effect on Appellee in the context of the traffic stop at issue.

**4.** We must note that the record fails to support the Commonwealth's assertion that Officer Mays walked away from Appellee while Appellee was walking toward his car door. Officer Mays testified that as Appellee approached the car door, Officer Mays turned around to start to go back to his car, but then he stopped and turned back around. N.T. Suppression, 1/23/06, at 10.

swer some questions at night in a rural location would tend to be daunting and render a citizen less likely to believe he could refuse the police request.

¶ 26 Finally, after Appellee denied possessing paraphernalia and drugs, police asked him to consent to a search but did not inform him that he could decline to consent to that search. Such advice can be a significant dynamic in determining whether a consent to search is constitutionally valid. *Strickler, supra; see also United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002); *Florida v. Bostick, supra.*[5]

¶ 27 The only factors that would substantiate a finding that a mere encounter occurred herein were that police told Appellee that he was free to leave, did not use a coercive tone, and did not display their guns. However, the record supports the suppression court's assessment that those elements did not outweigh the overwhelming indicia supporting the reasonableness of Appellee's belief that he could not refuse the officer's requests for more information and to search his car and person. We find that the suppression court properly applied the law to the facts and was correct in its assessment that Appellee reasonably believed that he was not free to disregard the police officer's request to answer questions and depart.

¶ 28 On appeal, the Commonwealth has disregarded all of the factors outlined in *Strickler.* Instead, it focuses upon the latter part of the interdiction, claiming that the officer merely asked Appellee if he minded answering some questions. How-

ever, as our Supreme Court observed in *Strickler,* when an individual has been subjected to a seizure, even though valid, and where the police continue to engage that person, the citizen, having been in official detention, is less likely to understand that he actually does have the right to refuse a request for more information or to refuse a search.

¶ 29 Along this same line, the Commonwealth suggests that the facts at issue in *Strickler,* which involved a rural road, two officers, and a defendant standing outside his car, render that case virtually indistinguishable. However, of vast importance is the fact that in *Strickler,* the police never initiated a traffic stop in the first instance. Strickler was not standing on the road because he had been directed to exit his vehicle by an officer. Rather, Strickler had stopped his vehicle of his own accord and was standing outside of his car when police arrived and approached him to ascertain whether he needed assistance. Thus, in *Strickler,* the police interdiction at the inception was a mere encounter, in contrast to this case where police initiated a seizure, shone a spotlight on the car, demanded that Appellee exit the vehicle, and questioned Appellee about his movements, criminal record, and possible possession of drugs. In addition, and unlike the defendant in *Strickler,* Appellee was not informed that he did not have to consent to the search of his car.

¶ 30 The Commonwealth also maintains that Officer Mays's statement to Appellee that he was free to leave renders it virtually impossible for Appellee to have held a reasonable belief that he was not free to

---

**5.** The *Strickler* court also stated that the "maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will), are to be taken into account" in assessing the reasonableness of a defendant's belief that he was not free to leave. *Id.* at 901. While Appellee herein did not complete high school, the trial court did not make a finding that Appellee's limited education impacted upon the reasonableness of his belief that he could not leave the scene. We therefore do not rely upon it as a factor in this appeal.

leave. In this respect, the Commonwealth relies heavily upon *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997) *(en banc), aff'd by an equally divided court without an opinion,* 557 Pa. 496, 734 A.2d 1275 (1999). Commonwealth's brief at 13–16.

¶ 31 After careful consideration, we conclude that the approach adopted by the *en banc* Superior Court in *Hoak* has been undermined by our Supreme Court's decisions in *Strickler* and *Freeman.* In *Hoak,* we placed undue emphasis on the import of the "free to leave" language. Clearly, the overriding importance that we placed on the "free to leave" verbiage is inconsistent with the approach in *Strickler* and *Freeman.*

¶ 32 The *Strickler* Court adopted a totality of the circumstances test and specifically stated that "conferral of the 'free-to-go' advice is, itself not a reason to forego a totality assessment" and therefore cannot be controlling in assessing whether a person would actually credit a police officer's indication that he was free to leave. *Strickler, supra* at 75 n. 24, 757 A.2d at 899 n. 24. The Court stated that other circumstances and police conduct contradictory to the verbal admonishment can give credence to the reasonableness of a defendant's belief that he, in fact, was not free to decline a police officer's request for more information. Thus, if through their actions, the police actually convey a contradictory impression, the gratuitous offering of a "free to go" statement will not erase a citizen's conclusion that he is not actually free to ignore the police and leave the area.

¶ 33 Freeman was also informed that she was free to drive away from the scene, but our Supreme Court nevertheless held that after dissemination of this advice, she had been subjected to a constitutional seizure. The Commonwealth attempts to distinguish *Freeman* on the basis that Appellee herein was not ordered from his car after he was told that he could leave, while the fact that Freeman was ordered to exit her car was a key factor in the Supreme Court's conclusion that she had been detained.

¶ 34 We find this position to be unavailing. The only reason that Appellee was outside of his car was due to the prior police directive that he exit it, and he had not yet been able to re-enter when Officer Mays re-initiated contact with him. Moreover, the fact remains that if Appellee had been in the driver's seat of his vehicle and told that he was free to leave, realistically, he would have been more inclined to believe that he actually could decline Officer Mays's request to answer more questions and depart.

¶ 35 In the concluding pages of its brief, the Commonwealth implies that if the subsequent interaction between Appellee and the troopers was, in fact, an investigatory detention, that seizure was supported by reasonable suspicion. The following facts are advanced as indicia of reasonable suspicion: 1) after Officer Mays stopped Appellee's car, there was "a lot of movement between the driver and the passenger, it was all focused down towards the floor boards and toward the passenger side of the vehicle," N.T. Suppression, 1/23/06, at 8; 2) Appellee was nervous; and 3) Officer Mays's inquiry into Appellee's criminal history "showed that there was a fingerprint at one time for Act 64 [the Drug Act], some kind of encounter with Act 64." *Id.* at 10.

¶ 36 First, we discount any reliance on Appellee's purported criminal history. There was no indication that Appellee's arrest resulted in a conviction, and Appellee, who was approximately forty years old when stopped, had his encounter with the drug act years prior to the interdiction.

*See id.* at 11. *Cf. Commonwealth v. Rogers,* 578 Pa. 127, 849 A.2d 1185 (2004) (reasonable suspicion present where, in addition to being so nervous that his hands were shaking, defendant produced incomplete, inconsistent, and false documentation for car, had a prior drug **conviction,** and had items to mask smell of marijuana in car).

¶ 37 Thus, any finding of reasonable suspicion rests solely upon the fact that Appellee and his passenger engaged in furtive movements and that Appellee appeared nervous. Furtive movements and nervousness, standing alone, do not support the existence of reasonable suspicion. *Commonwealth v. Reppert,* 814 A.2d 1196, 1206 (Pa.Super.2002) *(en banc)* ("we find no basis to conclude that excessive nervousness and furtive movements, even considered together, give rise to reasonable suspicion of criminal activity").

¶ 38 Since Appellee's consent to search his person and car was tainted by a detention that was not supported by the existence of reasonable suspicion, the suppression court properly suppressed the fruits of that search. *Freeman, supra; see Strickler, supra* at 57, 757 A.2d at 889 ("Where ... a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness.").

¶ 39 Order affirmed.

¶ 40 Judge Orie Melvin files a Dissenting Opinion.

DISSENTING OPINION BY ORIE MELVIN, J.:

¶ 1 I respectfully disagree with the majority's affirmation of the order granting the suppression of evidence seized as a result of a search of an automobile driven by Appellee, Terry E. Moyer. Specifically, I disagree with interpretation of the applicable case law as applied to these facts offered by the majority's opinion in support of affirming. Rather, I would find that application of the *Strickler* factors weighs in favor of the opposite result. That is, I agree with the Commonwealth's position that the latter portion of the interaction between Appellee and the state police officers was a mere encounter, not an investigative detention, and that Appellee's consent to search was given voluntarily. Thus, I would find Appellee's consent to search his vehicle was valid, and reverse the order which granted Appellee's motion to suppress.

¶ 2 First, I observe that the initial detention of Appellee ended when Corporal Mays issued the written warning, returned Appellee's license and registration, and advised Appellee that he was free to leave. Contrary to the majority's viewpoint, I find that the circumstances surrounding the interaction in *Strickler* were substantially identical to those involved in the instant case in that both interactions occurred on a rural road in the late evening/early morning hours, after the accused had been detained by two uniformed officers. Our Supreme Court expressly determined that these circumstances lacked coercive effect. *Id.* at 76–78, 757 A.2d at 900. In addition, subsequent questioning **unrelated to the purpose of the original stop** does not pose a federal constitutional impediment to the consent protocol immediately following a typical traffic stop. *Id.* at 67–68, 757 A.2d at 895. Moreover, the majority's conclusion that the fact that the troopers were armed is a factor weighing in favor of having a coercive effect is not supported by the case

law. *See id.* at 73 n. 22, 757 A.2d at 898 n. 22 (citing *Florida v. Bostick,* 501 U.S. 429, 432, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (noting that there was no evidence suggesting that the officer's "gun was ever removed from its pouch, pointed at Bostick, or otherwise used in a threatening manner"). Instantly, Appellee testified that the troopers were courteous to him and did not display their weapons to him during the interaction.

¶ 3 Finally, although the accused in *Strickler* was advised of his right to refuse to consent to the search, he was not advised, as was Appellee, that he was free to leave after the conclusion of the initial segment of the traffic stop. The *Strickler* Court held that the advice that the accused was free to refuse consent acted as a counterweight to the officer's failure to expressly advise the accused that he was free to leave. *Id.* at 78, 757 A.2d at 901. Conversely, in the case *sub judice,* Corporal Mays's advising Appellee that he was free to leave acted as a counterweight to Corporal Mays's failure to expressly advise Appellee that he had the right to refuse consent. Significantly, at the time Corporal Mays asked Appellee to answer a few more questions, Appellee had not yet re-entered his vehicle, and Corporal Mays thus had no opportunity or reason at that point to direct Appellee to step out of his vehicle or otherwise to direct him to move. *Compare Commonwealth v. Freeman,* 563 Pa. 82, 90, 757 A.2d 903, 907 (2000) (stating that "most significantly," it was the officer's direction to a previously-stopped motorist to step out of her vehicle that indicated an investigative detention). Based upon the foregoing and the controlling authority of *Strickler,* I would conclude that the latter portion of Appellee's interaction with Corporal Mays and Trooper Hertzog was a mere encounter and not a second, independent investigative detention.

¶ 4 Because Corporal Mays and Trooper Hertzog did not engage in the requisite show of authority during the latter portion of their interaction with Appellee for it to be characterized as a seizure or an investigatory detention, and, therefore, no second investigative detention occurred, it necessarily follows that Appellee's consent to search his car was valid so long as it was voluntarily given. *See Strickler, supra,* at 78 n. 27, 757 A.2d at 901 n. 27. Voluntariness is assessed pursuant to the following legal precepts:

> When evaluating voluntariness of consent, the totality of the circumstances must be evaluated. While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

*Commonwealth v. Gillespie,* 573 Pa. 100, 106–07, 821 A.2d 1221, 1225 (2003) (opinion announcing judgment of the court) (citations and quotation omitted). The mere presence of police, who naturally are armed, is not in and of itself coercion. *Id.* at 107, 821 A.2d at 1225.

¶ 5 In the case *sub judice,* the trial court made no independent conclusion concerning voluntariness. Further, although the suppression court noted that Appellee appeared to be "somewhat slow," this alone does not render the consent involuntary. As the Supreme Court stated in *Strickler,* "The reasons supporting the conclusion that Strickler was not seized at the time that he lent his consent to the vehicle search therefore also militate strongly in

favor of a determination that his consent was voluntary." *Id.* at 79–80, 757 A.2d at 902. The same analysis is appropriate in the instant matter, and I would therefore conclude that, applying the *Gillespie* factors to the facts as developed at the suppression hearing, Appellee's consent to search his vehicle was voluntary.

¶ 6 Because I have determined that Appellee gave valid consent to search his car and that the suppressed evidence was thus the product of a lawful search, I would reverse the order granting suppression. Therefore, I respectfully dissent.