J-A14038-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| LANCE WILLIAMS | : | |
| | : | |
| Appellee | : | No. 3525 EDA 2017 |

Appeal from the Order Entered September 27, 2017
in the Court of Common Pleas of Montgomery County
Criminal Division at No.:  CP-46-CR-0008669-2016

BEFORE:   GANTMAN, P.J., SHOGAN, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.:                          **FILED NOVEMBER 09, 2018**

The Commonwealth of Pennsylvania appeals[1] from the order of the Court of Common Pleas of Montgomery County granting the pretrial suppression motion of Appellee Lance Williams.  After careful review, we are constrained to reverse and remand for further proceedings.

"On June 6, 2017, as part of his omnibus pretrial motion, [Appellee] sought suppression of narcotics seized by police officers after a warrantless search of the vehicle he was driving on the evening of September 14, 2016."  Trial Ct. Op. at 1.  The omnibus pretrial motion alleged that Appellee's arrest

_____

[1] The Commonwealth certified in its notice of appeal that the order in question will terminate or substantially handicap its prosecution of Appellee.  Hence, we have jurisdiction over this appeal.  **See Commonwealth v. Moyer**, 954 A.2d 659, 661 n.1 (Pa. Super. 2008) (*en banc*) (citing **Commonwealth v. Dugger**, 486 A.2d 382 (Pa. 1985); Pa.R.A.P. 311(d)).

_____

\*   Retired Senior Judge assigned to the Superior Court.

was illegal and that the search of his vehicle was conducted without a warrant or probable cause. Omnibus Mot., 6/6/2017, at 3 (not paginated).

On August 22, 2017, the trial court held a hearing on the motion to suppress.[2] At the beginning of the hearing, Appellee contended that "the consent to search, which was alleged to have been obtained in this case, was done so in a not-knowing, voluntary, and intelligent manner. Therefore, any fruits therefrom deprive the defendant of his federal and constitutional rights." N.T., 8/22/2017, at 3.

The Commonwealth first presented the evidence of Officer Michael Dalbey, who was then serving with the Marlborough Township Police Department but, on the day of the incident, had been with the Upper Perkiomen Police Department. *Id.* at 4-6. Officer Dalbey testified that, on September 14, 2016, at approximately 7:00 P.M., he was stopped at a stop sign in his marked patrol vehicle while monitoring traffic at Penn Street and Route 663 in Pennsburg Borough, Montgomery County. Officer Dalbey continued that "[a] white Chrysler four-door passed by [his] location in the westward direction. It caught [his] attention because of the dark tinted windows." *Id.* at 7. Officer Dalbey explained that he followed that automobile for about half a mile before turning on his patrol car's red and blue lights. *Id.* at 7-8, 17.

_____

[2] "Our scope of review is limited to the evidence presented at the suppression hearing." **Commonwealth v. Thran**, 185 A.3d 1041, 1043 (Pa. Super. 2018) (citations omitted).

Officer Dalbey testified that, after the Chrysler pulled into the "well lit" parking lot of an E-Z Shoppe, he pulled his patrol vehicle behind the Chrysler, exited his vehicle, and approached the Chrysler "cautiously," as he did not "know the number of occupants in the vehicle" due to the overly tinted windows, including the back windshield. *Id.* at 7-8, 10. The driver of the Chrysler rolled down his side window and provided the officer with a Pennsylvania driver's license identifying him as Lance Williams. *Id.* at 8, 10. Officer Dalbey described Appellee as "jittery, kind of anxious or excited, [and] nervous[.]" *Id.* at 10. Two passengers were seated in the vehicle. *Id.* at 8.

Officer Dalbey asserted that he returned to his patrol vehicle, wrote a warning to Appellee to fix the Chrysler's illegally tinted windows within fifteen days, turned off his emergency lights, again exited his patrol vehicle, and asked Appellee "to meet [him] at the rear of the vehicle to discuss the warning card[,]" and that Appellee complied. *Id.* at 11. Officer Dalbey testified that he returned Appellee's license, *id.* at 22, then had the following conversation:

> During the explanation of why I stopped him, I told him why. And then when I told him he was free to leave, he turned around — he took like a step and a half, turned around, and reengaged me, and asked me how long I've been a police officer. We discussed that. He said his father was a police officer in Philadelphia. And then we started discussing my references to the city. And during the conversation, I came to know that he grew up on one side of Roosevelt Boulevard and I grew up on the other side of Roosevelt Boulevard. At that time, we engaged in further conversation. And I said, Lance, do you think this is a high-crime area? And he said, no, you guys probably get domestics or something. I said, no, we have a bad drug problem around here, man. So we continued to talk. And I said, listen, do you have any weapons or narcotics, anything that's going to hurt anyone? And he said no. I said, do

- 3 -

you mind if my partner, [O]fficer McVeigh arrives on the scene just to kind of back me up? And Lance's response was, no, you can check the vehicle, there's nothing in it. I said, are you sure? He said, yeah. He said, to the best of my recollection, the trunk smells like cat piss. And at that point, I indicated that [O]fficer McVeigh needed to search the vehicle.

*Id.* at 13-14. During cross-examination, Officer Dalbey testified that he never asked Appellee to sign a consent to search form and never told Appellee that he had a right to refuse his consent to search. *Id.* at 23-26.

Officer James McVeigh of the Upper Perkiomen Police Department testified next. *Id.* at 30. He testified that, when he arrived at the traffic stop, he parked his patrol vehicle in a small parking lot on a different street, where it could not be seen from Appellee's location. *Id.* at 41. Officer McVeigh corroborated that Officer Dalbey asked Appellee if "his partner could search the vehicle[,]" and that Appellee answered, "[Y]eah, you can search it, there's nothing in the vehicle." *Id.* at 34. He also confirmed that only two officers – himself and Officer Dalbey – were present at the time Appellee gave his consent to search the Chrysler. *Id.* at 41.[3] Officer McVeigh stated that neither Officer Dalbey nor Appellee raised their voices, but, instead, they had "a conversation like we're having now" while standing "pretty close, as if you're having a normal conversation with somebody." *Id.* at 35. Officer McVeigh acknowledged that he also never told Appellee that he had the right to refuse consent to search. *Id.* at 42-43. Officer McVeigh testified that, upon

---

[3] A third police officer, Officer Lavin, arrived after the vehicle search was complete and Appellee was arrested. N.T., 8/22/2017, at 24.

- 4 -

searching Appellee's vehicle, he found three packages of heroin, one of which was open, then handcuffed Appellee. *Id.* at 37, 40.

Appellee did not present any witnesses. *Id.* at 45.

At the conclusion of the hearing, the trial court permitted the parties to file briefs, *id.* at 46, and, on September 27, 2017, the court granted Appellee's motion to suppress. This appeal followed.

The Commonwealth raises one issue on appeal:

> Where a lawful traffic stop ended and devolved into a mere encounter, did the [trial] court err in suppressing the fruits of a voluntary, consensual search of the car [Appellee] was driving?

Commonwealth's Brief at 4.

Our standard of review from a challenge to a ruling on a suppression motion is as follows:

[O]ur role is to determine:

> whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. . . . Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 654 (2010) (internal quotations and citations omitted). Our scope of review is limited to the evidence presented at the suppression hearing. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073, 1080 (2013).

- 5 -

> ***Commonwealth v. Mackey***, 177 A.3d 221, 226 (Pa. Super. 2017).

***Commonwealth v. Thran***, 185 A.3d 1041, 1043 (Pa. Super. 2018).

> Our standard of review when the Commonwealth appeals from a suppression order is well-settled. . . . [W]hen an appellate court reviews the ruling of a suppression court, we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted.

***Commonwealth v. Rosas***, 875 A.2d 341, 346 (Pa. Super. 2005).

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures, including those entailing only a brief detention."

***Commonwealth v. Reppert***, 814 A.2d 1196, 1201 (Pa. Super. 2002) (*en banc*) (citation omitted).

> A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies. One such exception is consent, voluntarily given. The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus.

***Commonwealth v. Strickler***, 757 A.2d 884, 888-89 (Pa. 2000) (footnotes and citations omitted).

Our courts have delineated three different categories of police and citizen interactions: mere encounters, investigative detentions, and custodial detentions –

[I]n assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized.  Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need not be supported by any level of suspicion in order to maintain validity.  Valid citizen/police interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty:  the investigative detention or *Terry* stop[4], which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters.  To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; whereas, a custodial detention is legal only if based on probable cause.

*Id.* at 889 (footnote omitted) (citations omitted); *see Commonwealth v. Thomas*, 179 A.3d 77, 82 (Pa. Super. 2018) ("police officers may approach citizens and ask them questions without violating the Fourth Amendment" and "does not constitute a seizure"); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) (police can approach people at random, ask questions, and seek consent to search).

The level of police-citizen interaction may alter over the course of one incident.  For example, what begins as a mere encounter could escalate into

---

4 *See Terry v. Ohio*, 392 U.S. 1 (1968).  A "*Terry* stop" is "[a]n investigative detention [that] occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes." *Commonwealth v. Barber*, 889 A.2d 587, 592 (Pa. Super. 2005) (citation omitted).

an investigative detention and then devolve into a mere encounter. ***See***

***Strickler***, ***supra*** at 889-91.

After police finish processing a traffic infraction, the determination of whether a continuing interaction constitutes a mere encounter or an investigative detention centers upon whether the individual would objectively believe that he was free to end the interaction and to refuse a request to answer questions. ***See id.*** at 889-91 ("in the context of a traffic or similar stop, once the purpose for the stop has been completed, the question arises: Does the individual have objective reasons to believe that he is (or is not) free to end the police/citizen encounter?"), 899 ("In evaluating a consensual encounter that follows a traffic or similar stop, a central consideration will be whether the objective circumstances would demonstrate to a reasonable citizen that he is no longer subject to domination by police.").

Here, the parties do not dispute that: (1) the initial interaction between Appellee and Officer Dalbey was a proper traffic stop due to the Chrysler's illegally tinted windows and therefore a lawful investigative detention; and (2) this initial investigative detention ended when Officer Dalbey told Appellee he was free to leave and became a mere encounter. Commonwealth's Brief at 14; Appellee's Brief at 8, 11; N.T., 8/22/2017, at 7, 13-14; Trial Ct. Op. at 2, 6.

The Commonwealth contends that thereafter only a mere encounter existed and Officer Dalbey thus did not need any suspicion that Appellee was engaging in criminal activity when he requested Appellee's consent to search

- 8 -

the Chrysler. **See** Commonwealth's Brief at 13-14.[5] The Commonwealth argues that Appellee's "consent to search was valid largely for the same reasons that the second interaction was not a detention, but rather a mere encounter." **Id.** at 19.

Nevertheless, the trial court found: "Given the definitive change in tone and purpose from the 'small talk' initiated by [Appellee] after he was told he could leave, to the pointed questioning foisted upon him by the officers, the record in this case aptly reflects [Appellee] was, indeed, subject to an investigative detention." Trial Ct. Op. at 6. To resume an investigative detention, Officer Dalbey would have needed to have a reasonable suspicion that Appellee was engaging in criminal activity. **See Strickler**, 757 A.2d at 889-90. The trial court concluded that "[t]he Commonwealth failed to establish that the police officers had the requisite reasonable suspicion to support their investigatory detention." Trial Ct. Op. at 6.

Appellee agrees with the trial court that "any questions that succeeded the already completed traffic stop, particularly those of an investigative capacity[,] rendered the encounter an unlawful detention. This is especially apparent when Officer Dalbey asks about contraband in the vehicle." Appellee's Brief at 9.

---

[5] Throughout its brief, the Commonwealth refers to Appellee's consent as "voluntary" or "voluntarily" given. **See**, **e.g.**, Commonwealth's Brief at 4-5, 11-13. It also concedes that the trial court did not address whether Appellee's consent was voluntary. **See id.** at 11 n.3.

In its reply brief, the Commonwealth counters this contention, arguing that "[p]olice are permitted to ask questions, including 'investigative' questions, and may make requests for consent to search, during a mere encounter." Commonwealth's Reply Brief at 5.

Our inquiry is thereby threefold: (1) After Officer Dalbey informed Appellee that he was "free to leave," did the interaction between Appellee and Officer Dalbey escalate into an investigative detention or remain a mere encounter when Officer Dalbey asked Appellee additional questions? (2) If the interaction again became an investigative detention, did Officer Dalbey have reasonable suspicion of criminal activity? (3) Was Appellee's consent to search voluntary?[6]

_____

[6] The trial court only articulated two issues, stating that "the underlying appeal requires analysis of the following two questions": "[f]irst, whether [Appellee] was subjected to an investigatory detention; and second, whether the police possessed the requisite reasonable suspicion to detain [Appellee]." Trial Ct. Op. at 3. As the trial court found that Appellee was subject to an illegal investigatory detention, it did not need to reach the question of whether Appellee's consent to search his vehicle was voluntarily given.

However, the level of police-citizen interaction and the voluntariness of consent are distinct inquiries, albeit with overlapping analyses. **See Strickler**, 757 A.2d at 888-89 (finding that a party agreed to a search by police during a mere encounter does not automatically cause that party's consent to be voluntary: "[s]ince both the tests for voluntariness and for a seizure centrally entail an examination of the objective circumstances surrounding the police/citizen encounter to determine whether there was a show of authority that would impact upon a reasonable citizen-subject's perspective, there is a substantial, necessary overlap in the analyses"); **Commonwealth v. Bell**, 871 A.2d 267, 273 (Pa. Super. 2005) (*en banc*) ("[w]here the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus").

`To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.[8]

_____

[8] . . . [T]here is no litmus-paper test for distinguishing a consensual encounter from a seizure . . .

The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

**_Strickler_**, 757 A.2d at 889-90 (some footnotes and citations omitted; some formatting added).

While there is no definitive list of factors for the court to consider when determining if a police-citizen interaction is a mere encounter, where a reasonable person would believe that he or she is free to leave, or an investigative detention, "[t]he presence of an **express admonition** to the

- 11 -

effect that the citizen-subject is **free to depart** is a **potent, objective factor** that favors such conclusion." **Id.** at 899 (emphasis added).[7]

In **Commonwealth v. Randolph**, 151 A.3d 170, 178 (Pa. Super. 2016), *appeal denied*, 168 A.3d 1284 (Pa. 2017), a police officer's request for a driver "to step out of the vehicle to the rear to receive a written warning" before telling the driver he was free to leave did not affect the determination that the interaction was a mere encounter after the express admonition that the driver was allowed to depart. Other factors considered by this Court in **Randolph**, in determining that the interaction after the "free to leave" statement was a mere encounter include that the police officer "did not have sirens on his vehicle[,]" that the "interaction" between the driver and police was "calm and cordial[,]" and that "no physical contact" occurred.

Whether a patrol vehicle's flashing ("emergency") lights are switched on is another factor that appellate courts have considered, finding activated lights a signal to a reasonable person that he or she was not free to leave. **Commonwealth v. Livingstone**, 174 A.3d 609, 625 (Pa. 2017) (two justices joining; three justices concurring in part, dissenting in part; one justice

_____

[7] We recognize that even when a driver is told he is free to leave, subsequent interactions may still constitute a second seizure or investigative detention, requiring reasonable suspicion of criminal activity. **Commonwealth v. Freeman**, 757 A.2d 903, 907-08 (Pa. 2000). For example, a police officer asking a driver to "step out of the vehicle" after stating that she was "free to leave . . . constituted a greater show of authority than had previously been made" and was therefore a factor in determining that the interaction was an investigative detention. **Id.**

dissenting) ("a reasonable person in [a]ppellant's shoes would not have felt free to leave after [t]rooper . . . pulled his patrol car, with its emergency lights activated, alongside her vehicle"; held "[a]ppellant was seized and subjected to an investigative detention"), 638-39, 641 (all three justices concurring in part and dissenting in part agree on issue of activation of emergency lights elevates encounter from mere encounter to investigative detention); *Commonwealth v. Hill*, 874 A.2d 1214, 1219 (Pa. Super. 2005) (among other factors, activation of overhead lights weighed towards encounter being seizure and not mere encounter). Officers blocking a defendant's vehicle from moving has also been found to constitute a seizure, raising an encounter to an investigative detention. *Commonwealth v. Greber*, 385 A.2d 1313, 1315-16 (Pa. 1978) (one justice concurring; two concurring in result; one dissenting; one recusing). A "threatening" number of officers present and "the display of a weapon by an officer" are also "[e]xamples of circumstances that might indicate a seizure[.]" *Commonwealth v. Guess*, 53 A.3d 895, 900 (Pa. Super. 2012) (citations omitted).[8]

Ultimately, the "totality of the circumstances" test is a balancing test that allows us to weigh coercive and noncoercive factors against each other.

---

[8] Some facts that might suggest that an investigative detention had ended, such as police returning a driver's documents and handing over a written warning, may still be insufficient to reach such a conclusion, when other factors overwhelm them, such as the presence of multiple officers surrounding the vehicle and repeated questioning by an officer. *Commonwealth v. Sierra*, 723 A.2d 644 (Pa. 1999) (equally divided court).

*See Commonwealth v. Moyer*, 954 A.2d 659, 668 (Pa. Super. 2008) (*en banc*). For example, in **Moyer**, this Court found that multiple elements "support[ed] the belief that [the defendant] could not refuse the officer's requests for more information and to search his car[,]" including: that the officer reintroduced questioning "within seconds" after returning the defendant's documents; that "[t]here were two armed, uniformed police standing near" the defendant, "who was alone and isolated outside his car" at night on a rural, unlit road; that "[p]olice had activated . . . their red and blue flashing lights"; that police had initiated the traffic stop; that the officer stopped the defendant as he was walking from the rear of his vehicle back to the driver's side door; and that the defendant was not informed that he did not have to answer further questions. *Id.* at 664, 667-68.

Nevertheless, other facts indicated that only a mere encounter occurred when the officer asked the defendant if there were any controlled substances or paraphernalia in his car or on his person and requested to search the defendant's vehicle, including that the officer had already told the defendant that he was free to leave and that the officer did not use a coercive tone nor display his firearm. *Id.* This Court held that the former elements "outweigh[ed]" the latter facts and that, when the defendant gave his consent, the interaction still constituted an investigative detention. *Id.* at 667.

Here, considering the totality of the circumstances, we conclude that, at the time that Appellee agreed to the search of his vehicle, in view of all

- 14 -

surrounding circumstances, a reasonable person would have believed that he was free to leave. **See Strickler**, 757 A.2d at 889-91.

The most "potent, objective factor" in reaching this conclusion is that Officer Dalbey informed Appellee that he was "free to leave." **Strickler**, 757 A.2d at 899; N.T., 8/22/2017, at 13; **see also Moyer**, 954 A.2d at 664, 667-68 (factor weighed towards finding mere encounter).

Although Officer Dalbey had previously asked Appellee to step outside the vehicle and asked for permission to search the vehicle while Appellee was still outside, the request to exit the Chrysler occurred **before** the officer told Appellee that he was free to leave. N.T., 8/22/2017, at 11; **compare Randolph**, 151 A.3d at 178 (request to exit before permission to leave) **with Freeman**, 757 A.2 at 907 (request to exit after permission to leave).

Additionally, although Officer Dalbey questioned Appellee, it was only after Appellee **initiated** a conversation about the officer's police experience, and his own father's service as a Philadelphia police officer. The officer did not **repeatedly** question Appellee. His tone was conversational and nonthreatening. He had no physical contact with Appellee. Appellee was never placed in physical restraints at any time prior to the discovery of the heroin. N.T., 8/22/2017, at 35, 40; **see generally id.**; **see also Randolph**, 151 A.3d at 181-82 (where none of these factors exist, interaction is mere encounter); **Moyer**, 954 A.2d at 668 (no coercive tone supported finding of mere encounter); **see also Strickler**, 757 A.2d at 889 ("instances of police questioning involving no seizure or detentive aspect" – *i.e.* mere encounters

– are permitted); ***Thomas***, 179 A.3d at 82 (police questioning alone does not constitute seizure).

Officer Dalbey had also turned off the flashing lights in his patrol vehicle prior to giving Appellee the warning notice, and they were still off when Appellee agreed to the search.  N.T., 8/22/2017, at 11; ***cf. Livingstone***, 174 A.3d at 625 (activated flashing lights a signal to a reasonable person that he or she was not free to leave and therefore subject to an investigative detention); ***Moyer***, 954 A.2d at 667 (activated flashing lights were a factor in finding investigative detention and not mere encounter); ***Hill***, 874 A.2d at 1219 (same).

Neither Officer Dalbey's nor Officer McVeigh's patrol vehicles blocked Appellee's vehicle:  Officer Dalbey's vehicle was behind Appellee's; Officer McVeigh's vehicle was parked in a lot on a different street and could not even be seen from Appellee's location.  N.T., 8/22/2017, at 7, 41; ***cf. Greber***, 385 A.2d at 1315-16.  Only two officers were present when Appellee agreed to the search of the Chrysler, N.T., 8/22/2017, at 41, not a "threatening" number of officers, and there was no testimony that either officer pulled or drew attention to his firearm.  ***Cf. Guess***, 53 A.3d at 900 ("[e]xamples of circumstances that might indicate a seizure"); ***see also Moyer***, 954 A.2d at 668 (no display of weapons weighed towards finding mere encounter).  Furthermore, Appellee chose to return to Officer Dalbey and to resume their conversation; Officer Dalbey did not stop Appellee from returning to his vehicle.  ***Compare*** N.T., 8/22/2017, at 13-14 ***with Moyer***, 954 A.2d at 667 (defendant walked from

rear of car to car door when officer stopped him; element weighing towards finding investigative detention).

Additionally, in considering "the setting in which the conduct occur[red,] *Strickler*, 757 A.2d at 890 n.8, Appellee was not alone, as he had two passengers with him, and was not in an isolated, unlit location, since he had pulled into the "well lit" parking lot of a minimart. *Compare* N.T., 8/22/2017, at 7-8 *with Moyer*, 954 A.2d at 667-68 (defendant being alone in an isolated location weighed towards finding investigative detention).

Consequently, under the "totality of the circumstances" test we find no evidence of any coercive factors after the conclusion of the traffic stop. Accordingly, we find that an individual in Appellee's situation would have objective reasons to believe that he was free to leave and end the police-citizen interaction. *Strickler*, 757 A.2d at 889-91. We conclude that, after Officer Dalbey informed Appellee that he was free to leave, the entirety of their subsequent interaction prior to Appellee's grant of consent constituted a mere encounter, making Officer Dalbey's further questioning of Appellee permissible without any suspicion of criminal activity. *See id.* at 889 (mere encounters need not be supported by any level of suspicion in order to maintain validity); *see also Thomas*, 179 A.3d at 82 (police officers approaching citizens and asking them questions does not constitute seizure); *Bostick*, 501 U.S. at 434 (same).

Appellee suggests that if we "accept the Commonwealth's position that the instant case demonstrates a 'mere encounter' . . . the matter should be

remanded to the trial [c]ourt for findings on" whether Appellee's "consent to search was ultimately freely given." Appellee's Brief at 11.

However, as already noted, our standard of review is whether the trial court legally erred, not whether it abused its discretion. *Thran*, 185 A.3d at 1043. Additionally, although Appellee suggests that "[a]n additional evidentiary hearing may also be required[,]" (Appellee's Brief at 11), Appellee does not specify what additional useful evidence could be ascertained at another hearing.

In addition, Appellee argued during the suppression hearing that his consent was not "obtained" in a "knowing, voluntary, and intelligent manner." N.T., 8/22/2017, at 3. Thus, Appellee himself raised the issue of voluntary consent. We conclude that the Commonwealth produced sufficient evidence to establish voluntary consent in the totality of circumstances. Appellee did not present evidence to rebut the evidence which the Commonwealth had already produced. *See Commonwealth v. Moore*, 279 A.2d 179, 183 (Pa. 1971). Therefore, we do not need to remand to the trial court.

Therefore, we will now address the issue of whether Appellee voluntarily consented to the search of the Chrysler, based on the existing record, such that the trial court properly granted the motion to suppress.

"In connection with such inquiry, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or

implied, or a will overborne — under the totality of the circumstances." ***Strickler***, 757 A.2d at 901.

This analysis overlaps with the assessment of the validity of the citizen-police interaction giving rise to the consent and also involves a totality of the circumstances test, balancing noncoercive and coercive factors. ***See id.*** at 888-89, 901-02 ("reasons supporting the conclusion that [the defendant] was not seized at the time that he lent his consent to the vehicle search therefore also militate strongly in favor of a determination that his consent was voluntary"); ***Commonwealth v. Valdivia***, 145 A.3d 1156, 1166 (Pa. Super. 2016) *appeal granted*, 165 A.3d 869 (Pa. 2017) (citations and internal quotation marks omitted) (when there is mixture of coercive and non-coercive factors at time of [police] request to search, court must balance factors).

For example, whether the defendant had been informed by police that he was free to leave, whether police returned the defendant's documentation, whether there was "evidence of police abuses, aggressive tactics, coercive language, coercive tone of voice, physical contact, or the use of physical restraints at any time during the detention," and whether the location was open, public, and well-lighted are major factors in determining the voluntariness of the defendant's consent to search. ***Id.***; ***see Randolph***, 151 A.3d at 181-82. Here, there is no dispute that Officer Dalbey informed Appellee that he was free to leave. (***See*** N.T. Hearing on Motion to Supress, 8/22/17, at 13).

We view the evidence presented at the suppression hearing, in the totality of circumstances. We consider all of the noncoercive factors noted in our analysis finding this police-citizen interaction to be a mere encounter. These include that Officer Dalbey told Appellee that he was free to leave prior to Appellee's agreeing to the search, N.T., 8/22/17, at 13-14. He had returned Appellee's documentation. *See id.* at 22. He had not engaged in any abuse, aggressive tactics, coercive language, coercive tone of voice, or physical contact, *id.* at 35, or used physical restraints. *See id.* at 40. Accordingly, we hold that Appellee's consent was freely and voluntarily given and that, consequently, Officer McVeigh's search of Appellee's vehicle was proper. *See Valdivia*, 145 A.3d at 1166; *Randolph*, 151 A.3d at 181-82.

We conclude that the drugs were legally seized from the vehicle. Therefore, we are constrained to hold that the trial court improperly granted Appellee's motion to suppress. Thus, we reverse the order granting Appellee's suppression motion. Accordingly, we remand this case for trial.

Order reversed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/9/18