J-S18024-23

2023 PA Super 190

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHRISTIAN OCHOA | : | |
| | : | |
| Appellant | : | No. 1216 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 29, 2022
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0001788-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CHRISTIAN OCHOA | : | |
| | : | |
| Appellant | : | No. 1217 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 29, 2022
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0001793-2021

BEFORE:   PANELLA, P.J., DUBOW, J., and STEVENS, P.J.E.[*]

OPINION BY DUBOW, J.:                    **FILED SEPTEMBER 29, 2023**

Appellant, Christian Ochoa, appeals from the March 29, 2022 Judgment of Sentence entered in the Bucks County Court of Common Pleas following his conviction of two counts of Possession with Intent to Deliver ("PWID") and related charges.[1]  Appellant challenges the denial of his pre-trial motion to

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 Pa.C.S. §780-113(A)(30).

suppress evidence. After careful review, we are constrained to vacate the judgment of sentence and remand for new trial consistent with this opinion.

The relevant facts and procedural history are as follows. In late January 2021, Appellant, a cross-country truck driver, drove a tractor trailer from California to Pennsylvania. On January 29, 2021, Appellant parked the tractor trailer at a truck stop in Allentown. He subsequently rented a white Jeep Wrangler ("Jeep") and drove to Philadelphia to pick up Edith Rodriguez-Cardenas ("Co-Defendant").[2]

At approximately 11:30 PM that evening, Appellant and Co-Defendant drove past Bedminster Township Police Officer James Zukow and Dublin Borough Police Officer Nicholas Swinehart, who were parked in separate patrol vehicles monitoring traffic on Route 313 exiting Dublin Borough into Bedminster Township. Officer Zukow began to follow the Jeep, and Officer Swinehart followed Officer Zukow. The record does not indicate why the officers chose to follow the Jeep.

Officer Zukow observed the Jeep's speed repeatedly fluctuate from the posted speed limit of 55 MPH to approximately 40 MPH. Officer Zukow further observed the driver side tires of the Jeep cross the double yellow lines several times and the passenger side tires pass over the white fog line on several occasions.

_____

[2] This Court affirmed Co-Defendant's Judgment of Sentence on August 21, 2023, at Docket Number 1731 EDA 2022. While the relevant facts largely overlap, the appellants raised distinct issues on appeal. Accordingly, we addressed the appeals separately.

After following the Jeep for approximately one to two miles, Officer Zukow activated his overhead lights and sirens and pulled the Jeep over for suspicion of driving under the influence ("DUI"). Officer Swinehart also stopped his vehicle, and his body camera recorded the traffic stop from the time he exited his vehicle until the officers' search of the Jeep.

The officers approached the Jeep and requested Appellant's license, which he provided. Officer Zukow retained possession of the license for the duration of the traffic stop. Based upon the speed fluctuations, swerving, and Officer Zukow's interactions with Appellant, Officer Zukow suspected that Appellant was impaired and requested that Appellant exit the vehicle to perform field sobriety tests, which Appellant completed successfully. After concluding that Appellant was not impaired, the officer informed Appellant that he had passed the tests. Notably, Officer Zukow did not return Appellant's driver's license, and there is no indication that Officer Zukow told Appellant that he was free to leave.[3]

Instead, the officer questioned Appellant, inquiring if he had any illegal substances in the Jeep, and Appellant responded that he did not. Officer Zukow asked Appellant for his consent to search the Jeep. Appellant consented, both orally and by signing the Bedminster Township Search and Seizure Consent Form. The form indicated that Appellant had been informed

---

[3] Indeed, Officer Zukow subsequently testified that he did not believe that Appellant was free to leave the scene after Appellant passed the sobriety tests. N.T. Suppression Hr'g, 11/9/21, at 120-21.

of his constitutional right to refuse the search. Approximately 13 minutes elapsed between the beginning of the stop and when Appellant signed the consent form.

Because it was a very cold night, Officer Zukow offered Appellant and Co-Defendant the opportunity to wait in Officer Swinehart's patrol vehicle during the search, and Appellant and Co-Defendant accepted. Officer Zukow told Appellant and Co-Defendant that they were not under arrest.

Appellant and Co-Defendant remained in Officer Swinehart's vehicle while Officer Zukow and other officers, who had arrived on the scene, searched the Jeep. The search yielded substantial amounts of controlled substances and U.S. currency.[4]

Following the search, officers took Appellant to the Bedminster Police Department headquarters, where Bucks County District Attorney's Office Detective Iran Millan interviewed Appellant. Bedminster Township Officer Stephen Pekach was also present during the interview. Ultimately, Appellant

---

[4] The parties stipulated that the following items were found in the search of the Jeep:

> A Louis Vuitton purse containing marijuana and a handwritten list of expenses; a black backpack containing 7,724 grams of Fentanyl[,] 983 grams of heroin[,] and 1,001 grams of cocaine; a second smaller black backpack containing 25.96 grams of methamphetamine and 66 Alprozolam pills; a digital scale; a total of $9,698 in U.S. currency; six phones[]; and a large hard top red suitcase with Greyhound bus tags on it.

Tr. Ct. Op., 11/14/22, at 10.

signed a waiver of his *Miranda* warnings, after initially invoking his right to counsel.[5]

The Commonwealth sought and obtained search warrants for at least three phones based upon an Affidavit of Probable Cause signed by Detective Millan and Officer Pekach. Officers also obtained a search warrant for Appellant's tractor trailer, which resulted in the recovery of substantial amounts of controlled substances and related items.[6]

The Commonwealth charged Appellant with numerous drug offenses at two dockets. The first docket addressed charges arising from the stop and search of the Jeep, which overlapped with charges against Co-Defendant. The charges at the second docket stemmed from the search of the tractor trailer.

On September 29, 2021, Appellant filed an Omnibus Pretrial Motion In it, he sought to suppress evidence deriving from the initial traffic stop, which he claimed was not justified, and his consent to search, which he argued was

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] The parties stipulated that the search uncovered $34,000 in U.S. currency and the following items in the tractor trailer:

> Marijuana in an amount for personal use; two glass pipes with methamphetamine residue; 976 counterfeit Percocet pills, which later tested positive for Fentanyl; 8,901 grams of Fentanyl; a loaded 45 caliber pistol, which was later found to be operable and the defendant did not have a license to carry at the time; four Jesus Malverde [] candles.

Tr. Ct. Op. at 11 (quoting the stipulated facts and describing Jesus Malverde as the patron saint of drug traffickers).

not lawful. Appellant also sought to suppress evidence based upon challenges to his waiver of his right to counsel and the search warrants for the cell phones.

On November 9, 2021, the trial court held a hearing on Appellant's motion to suppress at which Officer Zukow, Officer Swinehart, and Detective Millan provided testimony consistent with the above facts. On January 24, 2022, the trial court denied Appellant's motion to suppress.

On March 29, 2022, Appellant waived his right to a jury trial and proceeded to a stipulated waiver trial. Following its consideration of the evidence, the court found Appellant guilty on all counts.[7] That same day, the trial court sentenced Appellant to an aggregate term of 7 ½ to 15 years of incarceration for one count of PWID at each docket, with no additional penalty for the other counts.

---

[7] Specifically, at Docket Number CP-09-CR0001788-2021, the court found Appellant guilty of two counts of PWID, and one count each of Conspiracy to PWID; Use or Possession of Drug Paraphernalia; Deliver/Intent to Deliver Drug Paraphernalia; and Disregarding Traffic Lanes. 35 Pa.C.S. § 780-113(a)(30);18 Pa.C.S. § 903; 35 Pa.C.S. §§ 780-113(a)(32), (33); 75 Pa.C.S. § 3309(1), respectively.

The court found Appellant guilty at Docket No. CP-09-CR-0001793-2021 of two counts of PWID; and one count each of Conspiracy to PWID; Dealing in the Proceeds of Unlawful Activity; Conspiracy to Dealing in the Proceeds of Unlawful Activity; Firearms not to be Carried Without a License; and Possession of Weapon. 35 Pa.C.S. § 780-113(a)(30); 18 Pa.C.S. §§ 903, 5111(a)(1), 903; 6106(a)(1); and 907(b), respectively.

Appellant filed a Notice of Appeal on April 27, 2022. Subsequently, Appellant and the trial court complied with Pa.R.A.P. 1925. Before this Court, Appellant raises the following questions:

> 1. Did the trial court err by denying Appellant's Motion to Suppress the initial stop and seizure of the vehicle which appellant was operating on January 29, 2021?
>
> 2. Did the trial court err by denying Appellant's Motion to Suppress the search of the vehicle Appellant was driving on January 29, 2021 by ruling that the verbal and written consent was not coerced and was made knowingly, intelligently, and voluntarily?
>
> 3. Did the trial court err by denying Appellant's Motion to Suppress the search and seizure of the cell phones belonging to Appellant and found in his vehicle by ruling that the search warrants articulated probable cause?
>
> 4. Did the trial court err by denying Appellant's Motion to Suppress his January 30, 2021 statements to law enforcement in violation of his rights as protected by Article I, section 8 and 9 of the Pennsylvania Constitution and the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United State Constitution?

Appellant's Br. at 8-9.[8]

**A.**

Each of Appellant's four issues challenge the trial court's denial of his suppression motion. Our scope and standard of review of an order denying suppression are well settled:

> [O]ur standard of review for the denial of a suppression motion is *de novo* and is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Our scope of review is to consider only the evidence of the

---

[8] This Court, *sua sponte*, consolidated Appellant's appeals from his two dockets.

Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole. When the sole issue on appeal relates to a suppression ruling, our review includes only the suppression hearing record and excludes from consideration evidence elicited at trial.

*Commonwealth v. Green*, 265 A.3d 541, 550–51 (Pa. 2021) (internal citations and quotation marks omitted). Moreover, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019) (citation omitted).

**B.**

In his first issue, Appellant challenges the trial court's denial of his Motion to Suppress claiming that the initial traffic stop was illegal. It is axiomatic that if a "detention violates the Fourth Amendment, then any evidence seized during that stop must be excluded as fruit of an unlawful detention." *Commonwealth v. Mattis*, 252 A.3d 650, 654 (Pa. Super. 2021).

Under the Vehicle Code, a police officer has authority to stop a vehicle if he or she "has reasonable suspicion" that a Vehicle Code violation "is occurring or has occurred" for the purpose of, *inter alia*, "secur[ing] such other information as the officer may reasonably believe to be necessary to enforce the provisions of [the Code]." 75 Pa.C.S. § 6308(b). Whether an officer must possess probable cause or reasonable suspicion for a constitutional traffic stop depends on the nature of the suspected violation. *See Commonwealth v. Salter*, 121 A.3d 987, 993 (Pa. Super. 2015). In the case of DUI, an officer

may stop a vehicle if he or she has reasonable suspicion that the driver is operating the vehicle under the influence of alcohol or controlled substances to "provide the officer the needed opportunity to investigate further[.]"[9] ***Id.***

Appellant claims that the officers subjected him to an unlawful investigatory detention because they did not have reasonable suspicion to suspect him of DUI. Appellant's Br. at 17-21. After careful review of the record, we disagree and instead conclude that the record supports the suppression court's determination that the officers had reasonable suspicion that Appellant was DUI.

We initially defer to the trial court's finding that the officers were credible and the court's recognition that Officer Zukow had specific training in DUI detection and enforcement. Tr. Ct. Op. at 14. Based upon the evidence presented by the Commonwealth, the record amply supports the court's conclusion that Officer Zukow had reasonable suspicion that Appellant was DUI based upon his observations of Appellant's speed fluctuations and his swerving over the double yellow and white fog lines, even if the vehicle did not swerve as significantly as in some of the cases cited by Appellant. Tr. Ct. Op. at 13-15. Accordingly, we conclude that the initial traffic stop did not violate constitutional protections and that the trial court did not err in denying suppression on this basis.

---

[9] In contrast, "[i]f it is not necessary to stop the vehicle to establish that a violation of the Vehicle Code has occurred, [such as in the case of speeding,] an officer must possess probable cause to stop the vehicle." ***Id.***

- 9 -

## C.

Appellant next challenges the suppression court's conclusion that he voluntarily consented to the search of the Jeep. Appellant's Br. at 21-26. It is undisputed that the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from "unreasonable searches and seizures." U.S. CONST. amend. IV; PA. CONST. art. I, § 8. While a warrant is generally required for a search, "[o]ne of the limited exceptions to the warrant requirement is a consensual search." ***Commonwealth v. Valdivia***, 195 A.3d 855, 861 (Pa. 2018). To determine the legality of a consensual search, we apply a two-prong assessment in which we first determine "the constitutional validity of the citizen/police encounter giving rise to the consent" and then consider the voluntariness of the consent. ***Mattis***, 252 A.3d at 654.

In regard to the first prong relating to the validity of the citizen/police encounter, "[w]here a consensual search has been preceded by an unlawful detention, the exclusionary rule requires suppression of the evidence." ***Id***. at 655. Courts evaluate the lawfulness of a citizen/police encounter by first determining whether the individual is "free to leave" or whether the situation involves an investigatory detention or an arrest.[10] ***Commonwealth v.***

---

[10] Each of the three categories of citizen/police encounters requires an officer to have a different level of suspicion that the individual has engaged in criminal activity. Specifically, (1) mere encounters, where the individual is free to leave, require no suspicion; (2) investigative detentions require reasonable
*(Footnote Continued Next Page)*

*Strickler*, 757 A.2d 884, 889 (Pa. 2000). "[T]he 'free-to-leave' standard presents the central inquiry of whether, considering the totality of the circumstances, the relevant police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Commonwealth v. Cost*, 224 A.3d 641, 650 (Pa. 2020) (citation and quotation marks omitted).

"Thus, in the context of a traffic or similar stop, once the purpose for the [initial] stop has been completed, the question arises: Does the individual have objective reasons to believe that he is (or is not) free to end the police/citizen encounter?" *Strickler*, 757 A.2d at 891. If the individual is free to leave, "the police are free to ask questions appropriate to a mere encounter, including a request for permission to search the vehicle." *Mattis*, 252 A.3d at 655. In contrast, "where the purpose of an initial traffic stop has ended and a reasonable person would not have believed that he was free to leave, the law characterizes a subsequent round of questioning by the police as an investigative detention or arrest[.]" *Id.* In such cases, the officers must possess reasonable suspicion or probable cause, respectively, of criminal activity to support the additional questioning and investigation.

We look to the totality of the circumstances in considering whether a reasonable person would feel free to leave a traffic stop, "with no single factor

---

suspicion; and (3) custodial detentions or arrests require probable cause. *Commonwealth v. Collins*, 950 A.2d 1041, 1046 (Pa. Super. 2008) (*en banc*).

dictating the ultimate conclusion as to whether a seizure has occurred." ***Strickler***, 757 A.2d at 890.  Courts have identified numerous relevant factors in assessing whether a person is free to leave.[11]  One "potent, objective factor" is whether the officer expressly informed the individual that they were free to leave.  ***Id.*** at 899.  Another significant factor is whether the officer has retained possession of the driver's license.  ***See Mattis***, 252 A.3d at 656; ***Commonwealth v. Lopez***, 609 A.2d 177 (Pa. Super. 1992); ***cf. Cost***, 224 A.3d at 651 (observing in regard to a non-traffic stop "that the retention by police of an identification card to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment").

In ***Mattis*** and ***Lopez***, as in the instant case, officers engaged in an initial lawful traffic stop.  After addressing the purpose of the initial stop, the officers retained the drivers' licenses and questioned the drivers regarding issues unrelated to the initial stop and for which the officers did not have

---

[11] A non-exclusive list includes:  the "existence of the prior, lawful detention [which engrafts] a degree of coercion on the encounter[;]" "the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless, . . . thus suggesting to a citizen that his movements may remain subject to police restraint[;]" the "show of weapons, unusual commands[, or] aggressive behavior" by police[;]" and other "temporal and geographic elements of the interaction[.]" ***Strickler***, 757 A.2d at 898-900.  Courts have also recognized that the existence of a police vehicle positioned behind or beside the individual's vehicle with emergency lights activated favors the conclusion that the individual is not free to leave.  ***See Commonwealth v. Livingstone***, 174 A.3d 609, 619 (Pa. 2017) (Todd, J., setting forth the Opinion of the Court as to Part II(B)).

reasonable suspicion of criminal activity.[12] The officers, then, requested and received the drivers' consent to search the vehicles. This Court ultimately concluded that the drivers were not "free to leave" while the officers retained their licenses and subjected them to additional investigation beyond the purpose of the traffic stop.[13] *Mattis*, 252 A.3d at 656. We held that, because the investigative detentions were not supported by reasonable suspicion of criminal activity, they were unlawful, which, in turn, "tainted" the consents to search and rendered them invalid. *Lopez*, 609 A.2d at 182; *Mattis*, 252 A.3d at 656. Accordingly, we remanded for new trials, holding that the searches were unconstitutional.

_____

[12] Specifically, in *Mattis*, the officer lawfully stopped Mattis for a speeding violation. The officer then requested that Mattis step out of the vehicle to determine why he "was so nervous[,]" and questioned Mattis whether he had anything illegal in the vehicle. *Mattis*, 252 A.3d at 656. This Court concluded that nervousness alone "does not provide reasonable suspicion for an investigative detention." *Id.* at 655.

In *Lopez*, the officer stopped the driver for a Vehicle Code violation related to the tow chains between the rental truck and the towed vehicle. *Lopez*, 609 A.2d at 179. The officer validly ordered the driver out of the vehicle to address the violation but then began questioning Lopez, *inter alia*, as to whether he had anything illegal in either vehicle, without having reasonable suspicion that Lopez had engaged in any violations beyond the tow chain. *Id.* at 180-81.

[13] The Dissent argues that "unlike *Mattis* and *Lopez*, where the defendants were found not 'free to leave' while the officers retained their licenses, the trial court in this matter specifically found that a reasonable person in Appellant's circumstances would have realized that they were free to terminate the interaction and leave." Dissenting Opinion at 2. We respectfully disagree with the Dissent's conclusion. A reasonable person would not realize that he was free to leave the traffic stop when the police still held his driver's license under the totality of circumstances in this case, as described *infra*.

In light of **Mattis** and **Lopez**, we are constrained to conclude that the suppression court erred in applying the law to the facts of this case when it denied suppression, concluding that "a reasonable person under the circumstances, would acknowledge their right to terminate the interaction[.]"[14] Tr. Ct. Op. at 17. Although we agree with the trial court that the initial traffic stop was valid as it was based on reasonable suspicion that Appellant was DUI and that the investigatory detention of the traffic stop ended when the officer stated that Appellant was safe to drive and not under arrest, our agreement ends there. **Id.** at 17.

In particular, we reject the trial court's conclusion that Appellant was free to leave after the police completed the sobriety test. Instead, by retaining Appellant's driver's license, the police created a legal impediment to Appellant's ability to leave the scene of the traffic stop. In other words, if Appellant had driven away from the stop while the police held onto his driver's license, Appellant would be violating traffic laws. **See** 75 Pa.C.S. § 1511(a) ("Every licensee shall possess a driver's license issued to the licensee at all times when driving a motor vehicle[.]"). Thus, by retaining Appellant's

---

[14] In so holding, the court emphasized that, based upon its viewing of body camera video, "the tenor of this entire encounter was not coercive," as the "parties were cooperative and respectful to each other." **Id**. at 17-18. It also observed that the interaction was brief, lasting only thirteen minutes between the initial stop and the signing of the consent. **Id.** at 17. The court, however, did not address Officer Zukow's testimony that he "did not tell [Appellant] that he was free to leave" nor did the court acknowledge the officer's testimony that he did not believe that Appellant "was free to leave" after the officer determined that Appellant was capable of safe driving. N.T. Suppression Hr'g at 120-21.

driver's license, the police prevented Appellant from legally leaving the scene of the traffic stop in his vehicle. This is particularly relevant in this case where the traffic stop was on a rural road on a frigid night, where Appellant could not easily walk away when the police continued to question him.

Additionally, the record does not indicate that the officers informed Appellant that he was free to leave following the traffic stop, which our Supreme Court has noted is a "potent, objective factor." **Strickler**, 757 A.2d at 899. While the suppression court correctly emphasized that no one factor controls the determination of whether an individual is free to leave an encounter, the court failed to acknowledge the significance of these two substantial factors in light of the totality of the circumstances.[15]

Accordingly, by continuing to question Appellant, the officers subjected Appellant to a second investigatory detention which was not supported by reasonable suspicion of any criminal activity other than the previously-resolved suspicion of DUI. Absent reasonable suspicion, this investigatory detention was unlawful, and Appellant's consent was invalid. Accordingly, all evidence derived from the search, including the evidence seized from the Jeep

_____

[15] Moreover, the officers testified that the encounter occurred late at night in a rural area, that the officers had parked their police vehicles, with lights illuminated, in front and behind Appellant's vehicle, and that multiple uniformed officers were on the scene. N.T. Suppression Hr'g at 175-76, 124, 130-31. These additionally weigh in favor of concluding that Appellant was not free to leave, based on the totality of the circumstances. Indeed, as argued by Appellant's counsel, "what reasonable human being on this planet would think that they could walk away from that scene?" **Id.** at 258-59.

and the tractor trailer, as well as Appellant's subsequent statements, should have been suppressed.[16]

Accordingly, we vacate the judgment of sentence and remand to the trial court for a new trial.

Judgment of sentence vacated; case remanded for new trial. Jurisdiction is relinquished.

President Judge Panella joins the opinion.

President Judge Emeritus Stevens files a dissenting opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/29/2023

---

[16] As we conclude that Appellant's consent to search was invalid, we need not address his challenges to the denial of his Motion to Suppress his statements and the evidence from the search and seizure of the cell phones, which derived from the unlawful search of the Jeep.