J-S23009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                  :                PENNSYLVANIA
                                  :
            v.                        :
                                  :
                                  :
ROBERT ALTON EUGENE BUTLER   :
                                  :
             Appellant       :      No. 1747 EDA 2023

Appeal from the Judgment of Sentence Entered June 1, 2023
In the Court of Common Pleas of Montgomery County
Criminal Division at No: CP-46-CR-0000720-2021

BEFORE:    STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:            **FILED OCTOBER 25, 2024**

Appellant, Robert Alton Eugene Butler, seeks review of the judgment of sentence entered by the Court of Common Pleas of Montgomery County (trial court). Following a traffic stop, police were given verbal consent by Appellant to search his vehicle without a warrant. Police then found a bag of methamphetamine and syringes, and at a subsequent non-jury trial, Appellant was found guilty of possession of that contraband. In this appeal, Appellant asserts that the trial court erred in admitting the fruit of the vehicle search into evidence because his consent was involuntary. We find no merit in that ground and therefore affirm the judgment of sentence.

The underlying facts of the case are not in dispute. At about 2:00 a.m. on June 12, 2020, Appellant was pulled over at a gas station by two police

_____

[*] Retired Senior Judge assigned to the Superior Court.

officers in West Norriton Township because his vehicle's taillights were inoperable. Upon being notified of the issue, Appellant exited his vehicle to try to fix the taillights with tools in his trunk. Appellant explained to one of the officers, Sergeant Christopher Avery, that he had recently installed a subwoofer to enhance the vehicle's sound system, and that it may have caused the lights to malfunction.

While Appellant was trying to fix his taillights, Sergeant Avery asked him to produce his license and registration. Appellant complied, and Sergeant Avery soon discovered that Appellant's license was suspended. At around the same time, Sergeant Avery used his flashlight to view the vehicle's inspection stickers on the front windshield – this inadvertently allowed the officer to see a metallic box protruding from under the front driver's seat of the vehicle. Nevertheless, Sergeant Avery returned to Appellant his license and registration, and told him that he would be let off with a warning. The officer also advised Appellant to have his taillights fixed and to get a ride home because driving his own vehicle was dangerous.

By this point, the stop had lasted about 10 to 15 minutes, and Appellant was standing by the passenger side of his vehicle. Moments after telling Appellant that he was free to leave, Sergeant Avery directed Appellant back to the driver's side of the vehicle to ask him about the metallic box. Appellant walked over and then denied that the box contained anything illegal. When asked by Sergeant Avery if he could search the vehicle, Appellant said, "sure, go ahead." N.T. Suppression Hearing, 2/3/2023, at 10-11, 20, 24.

- 2 -

Sergeant Avery entered the vehicle and recovered from the box a bag of methamphetamine, as well as syringes. Appellant was arrested based on his possession of the contraband, and he verbally admitted to Sergeant Avery that he used methamphetamine. According to Sergeant Avery, Appellant also "said he didn't realize he had any [contraband] in the vehicle." *Id*., at 12. He was charged with knowing and intentional possession of a controlled substance, and possession of drug paraphernalia.

Prior to trial, Appellant argued in his omnibus pretrial motion that the fruit of the vehicle search had to be suppressed because it was not supported by a valid warrant and his consent was the product of police coercion. Appellant argued further in a separate suppression motion that the search was beyond the scope of the initial traffic stop, making the extended detention unlawful and rendering the consent for the vehicle search involuntary.

The trial court held a suppression hearing at which Sergeant Avery testified in line with the above facts:

> [Commonwealth]: So from the time you initiated the traffic stop to the time you gave the documents back, how much time had passed?
>
> [Sergeant Avery]: Maybe 10 minutes, 15 minutes, somewhere along there.
>
> [Commonwealth]: We saw you ask about the box, and can you just go into detail about that line of questioning?
>
> [Sergeant Avery]: Yes. When I walked up and looked at the inspection stickers, I could see a portion of the box sticking out from under the driver's seat. It did not look factory or stock which

- 3 -

is why it caught my attention. So that is why I asked him about it.

At that point, I had suspicions there might be something else in the vehicle.

[Commonwealth]: Did you speak to [Appellant] about anything else during this interaction?

[Sergeant Avery]: After this point right here, I again told him I was giving him a warning about the [suspended] driver's license.

I asked if he had any more questions for me. At that point [Appellant], he had some questions about the front fog lights -- or the lighting on the front of his car. So we stood in front of his car and talked about those for a minute or two.

[Commonwealth]: So he asked about lights on the front of his car --

[Sergeant Avery]: Correct.

[Commonwealth]: -- you spoke to him, you said, for about a minute or two?

[Sergeant Avery]: Probably, yeah. We were at the front of the car. It was something about the lighting or coloring or something on the front of his car we spoke about.

[Commonwealth]: He asked you about it?

[Sergeant Avery]: Correct.

[Commonwealth]: Then what happened?

[Sergeant Avery]: At that point, after I spoke to him about his front lighting, I started back to my patrol vehicle, and that's when I asked [Appellant] if he had anything illegal in his vehicle. He told me he did not. I asked him if I could search his vehicle, and he said, sure, go ahead. Something along those lines of go ahead.

*Id*., at 10-11.

- 4 -

Sergeant's Avery's account of the traffic stop and the subsequent vehicle search was found to be credible.[1]  The trial court determined that the traffic stop had concluded by the time Appellant consented to Sergeant Avery's request to search the vehicle.  However, the trial court did not construe the conduct of the police as compelling Appellant's compliance; nor did the trial court view the police action as coercing Appellant into giving consent.  Since a reasonable person would have felt free to leave, Appellant was not being held in custody when he consented to the search, and the consent was voluntarily given.  *See* Trial Court 1925(a) Opinion, 12/29/2023, at 71-76.

Appellant's suppression motion was denied, and at a non-jury trial, he was found guilty of the above enumerated counts.  Appellant timely appealed, and both he and the trial court complied with Pa.R.A.P. 1925.  In his brief, Appellant raises a single issue:

> Did the lower court err in denying [Appellant's] motion to suppress when the video and testimonial evidence introduced at the motion to suppress [hearing] established that [Appellant's] consent to the search of his vehicle was involuntary, since it was the product of an unlawful detention that extended beyond the mission of the original traffic stop and was not supported by either probable cause or a reasonable suspicion?

Appellant's Brief, at 3 (suggested answer omitted).

When considering a challenge to an order denying a suppression motion, we apply the following standard of review:

---

[1] Sergeant Avery's testimony was corroborated by video and audio recordings of the traffic stop.  Footage of the incident was recorded by the officer's body camera and equipment in his patrol vehicle.

> [O]ur standard of review . . . is *de novo* and is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Our scope of review is to consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole. When the sole issue on appeal relates to a suppression ruling, our review includes only the suppression hearing record and excludes from consideration evidence elicited at trial.

***Commonwealth v. Green***, 265 A.3d 541, 550–51 (Pa. 2021) (internal citations and quotation marks omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." ***Commonwealth v. Luczki***, 212 A.3d 530, 542 (Pa. Super. 2019) (quoting ***Commonwealth v. Clemens***, 66 A.3d 373, 378 (Pa. Super. 2013)). We will "not disturb the suppression court's credibility determinations absent a clear and manifest error." ***Commonwealth v. Fudge***, 213 A.3d 321, 326 (Pa. Super. 2019).

Here, Appellant argues that the trial court erred in denying his suppression motion because he was being unlawfully detained at the time he verbally consented to a vehicle search, rendering his consent to the search involuntary, and making the evidence obtained during the search inadmissible at trial.

There is no question that the initial traffic stop of Appellant's vehicle was lawful. Under the Vehicle Code, a police officer has authority to stop a vehicle if he or she "has reasonable suspicion" that a Vehicle Code violation "is occurring or has occurred" for the purpose of "secur[ing] such other

information as the officer may reasonably believe to be necessary to enforce the provisions of [the Code]." 75 Pa.C.S.A. § 6308(b).

Appellant does not dispute that the taillights of his vehicle were inoperable on the night in question, and that police had authority to pull him over on that basis. The crux of Appellant's claim, rather, is that after the initial stop had concluded, police continued detaining him, resulting in circumstances in which a reasonable person would not have felt free to deny police permission to conduct a search. Our disposition therefore turns on whether Appellant was being detained when Sergeant Avery asked for his consent to a search, and whether Appellant's consent was voluntarily given.

The Fourth Amendment to the United States Constitution, as well as Article I, Section 8 of the Pennsylvania Constitution, guarantee the right to be free from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Pa. Const. art. I, § 8; *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Commonwealth v. Cleckley*, 738 A.2d 427, 433 (Pa. 1999). A warrantless search is presumptively invalid unless a recognized exception to the warrant requirement applies. *See Commonwealth v. Slaton*, 608 A.2d 5, 8–9 (Pa. 1992).[2]

---

[2] If a "detention violates the Fourth Amendment, then any evidence seized during that stop must be excluded as fruit of an unlawful detention." *Commonwealth v. Mattis*, 252 A.3d 650, 654 (Pa. Super. 2021).

One such exception implicated here is consent. To establish this exception, the Commonwealth must prove that the individual gave voluntary consent during a lawful police interaction. *See Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000). Where the interaction is lawful, the constitutionality of the search hinges on the voluntariness of consent. *See id.*; *see also Commonwealth v. Randolph*, 151 A.3d 170, 177 (Pa. Super. 2016) (same). But where an individual is being unlawfully detained, the Commonwealth has the additional burden of demonstrating "not only voluntariness, but also, a break in the chain of illegality prior to the rendering of his consent." *Strickler*, 757 A.2d at 890. There is a "substantial, necessary overlap in the analyses" to determine whether a person has been seized and whether a person has voluntarily given consent while in custody. *Id*., at 901-02.

Pennsylvania law recognizes three types of interactions between police and citizens. The first is a mere encounter, which does not have to be supported by any level of suspicion; nor does such an interaction compel a citizen to stop and respond to an officer. *See id*. The second type of interaction is an investigative detention, or "*Terry* stop," which must be supported by reasonable suspicion. *See id*. The third type of interaction is an arrest, or custodial detention, which must be supported by probable cause that a crime has occurred. *See id*.

An investigative detention will end, and transition to a mere encounter, when a reasonable person released from custody would believe he is free to go. *See Randolph*, 151 A.3d at 177. "[A] central consideration will be whether the objective circumstance would demonstrate to a reasonable citizen that he is no longer subject to domination by police." *Strickler*, 757 A.2d at 899. The determination is made using a totality of the circumstances test. *See id*. Relevant factors in this inquiry include:

> (1) the presence or absence of police excesses; (2) whether there was physical contact; (3) whether police directed the citizen's movements; (4) police demeanor and manner of expression; (5) the location and time of the interdiction; (6) the content of the questions and statements; (7) the existence and character of the initial investigative detention, including its degree of coerciveness; (8) the degree to which the transition between the traffic stop/investigative detention and the subsequent encounter can be viewed as seamless . . . thus suggesting to a citizen that his movements may remain subject to police restraint; and (9) whether there was an express admonition to the effect that the citizen-subject is free to depart, which is a potent, objective factor.

*Randolph,* 151 A.3d at 177 (quoting *Strickler*, 757 A.2d at 898).

Applying those factors to the case at hand, we cannot find that the trial court erred in ruling that Appellant had been released from police custody at the time he voluntarily acquiesced to a search of his vehicle. Two officers were present at the traffic stop and neither made physical contact with Appellant. Only Sergeant Avery spoke to Appellant, who had no interaction with the other officer. The encounter took place in a well-lit gas station parking lot, and Appellant's movements were in no way restricted, as he exited

- 9 -

his vehicle of his own volition (and even began trying to fix the vehicle's electrical system).

Neither the testimony of Sergeant Avery, nor the recordings of the incident introduced at the suppression hearing, suggested that police ever used a hostile or aggressive demeanor toward Appellant. The discussions between Sergeant Avery and Appellant were entirely cordial. In fact, at the conclusion of the valid traffic stop, Sergeant Avery gave Appellant his license and registration, told him he was only being given a warning, and advised that he should get a ride home because his own vehicle was not safe to operate. The traffic stop definitively ended there.

We are not persuaded by Appellant's argument that he was then detained and thereby compelled to give consent for a search moments later when Sergeant Avery directed him to the front driver's side of Appellant's vehicle, asked if the box under the seat contained contraband. "Where the purpose of an initial, valid traffic stop has ended and a reasonable person would have believed he was free to leave, the law characterizes the subsequent round of questioning by the officer as a mere encounter." *Commonwealth v. By*, 812 A.2d 1250, 1255 (Pa. Super. 2002).

While there are cases, notably *Commonwealth v. Moyer*, 954 A.2d 659 (Pa. Super. 2008), in which police questioning after a traffic stop resulted in a continuation of a custodial detention, the conduct of the officers was coercive in ways that are absent here. In *Moyer*, the defendant was pulled

- 10 -

over for an inoperable taillight. He was told by police to repair the light, given a warning, and advised that he was free to leave. But as the defendant was about to reenter his vehicle, one of two officers present called the defendant's name and confronted him with the fact that he had previously been accused of possessing controlled substances, and that the officer had observed furtive movements in the car after he was pulled over. The officer asked the defendant if he had any drugs in his vehicle or on his person, and the defendant stated that the did not. *See Moyer*, 954 A.2d at 662-63.

The officer nevertheless asked the defendant if he could search the car and the defendant's person. The defendant consented, and a crack pipe was discovered in both locations. At trial, he successfully challenged the admissibility of that evidence, and it was excluded on the ground that the conduct of the police had been sufficiently coercive to amount to a detention which rendered the consensual search involuntary. *See id*.

On review, this Court highlighted a number of coercive factors, including the stop taking place remotely "at night in a rural location"; the officer's accusations of past drug activity; and the defendant having been ordered out of his vehicle during the stop, limiting his freedom of movement at the time consent for the searches were sought. *See Moyer*, 954 A.2d at 666-69.

All of those critical circumstances are absent in the present matter.[3] Appellant's traffic stop took place at a well-lit gas station, the police made no accusations of past crimes, and Appellant exited his car of his own volition. Sergeant Avery directed Appellant to the front driver's side of his vehicle only to show him the black box under the driver's seat.

The facts of the present case are more analogous to the facts of another traffic stop case, *By*. There, the defendant was pulled over in a motel parking lot due to having tinted windows. The defendant was given a warning and told he was free to leave. But before he did so, one of three officers present asked the defendant if he was in possession of any drugs. The defendant became noticeably nervous and began to perspire, prompting the officer to remind him that he was free to go. The defendant consented to a vehicle search which yielded controlled substances and a firearm. The trial court subsequently denied the defendant's constitutional challenge to the admissibility of that evidence. *See By*, 812 A.2d at 1253-54.

On review, this Court affirmed after weighing the factors that militated both for and against a finding of an unlawful detention once the traffic stop

---

[3] The *Moyer* Court also emphasized the fact that the defendant was never told he had the right not to answer questions and the right not to grant consent. *See Moyer*, 954 A.2d at 662-63. While Appellant was similarly not told of these rights, we find that this fact does not weigh as heavily in his favor as it did the defendant in *Moyer* because the latter individual had been accused of past drug crimes when police sought to search his vehicle for drugs. This made it all the more incumbent on the officers in *Moyer* to expressly clarify the nature of the interaction, which they did not do. *See id*.

had concluded. We found it significant that the police spoke to the defendant in a casual, non-threatening, and non-accusatory tone, and the defendant's freedom of movement was never restricted by either a show of force or a direct command. *See id*., at 1256-58

Moreover, despite there being three armed officers, two of them had barely interacted with defendant, and they had not been positioned in a way that would have impeded his departure. This Court held under those facts that the defendant had not been detained after his traffic stop was over despite the questioning of police. For much the same reason, the defendant's consent was found to be voluntary. *See id*., at 1258; *see also Randolph*, 151 A.3d at 177 (relying on *By* to affirm denial of suppression motion where "calm and cordial" police questioning followed a traffic stop, the defendant's "movements were minimally directed," and there were "no police abuses or aggressive tactics.").[4]

---

[4] In his brief, Appellant cited several other cases in support of his contention that he remained in police custody even after he was told that he was free to go. All of those cases, however, are materially distinguishable. *See e.g., Commonwealth v. Ochoa*, 304 A.3d 390 (Pa. Super. 2023); *Commonwealth v. Commonwealth v. Mattis*, 252 A.3d 650 (Pa. Super. 2021); *Commonwealth v. Lopez*, 609 A.2d 177 (Pa. Super. 1992). For example, in *Ochoa*, a traffic stop was unlawfully extended because police ordered the defendant out of his car, did not return his driver's license, or tell him he was free to go before questioning him about whether there was contraband in his vehicle. In both *Mattis* and *Lopez*, an officer unlawfully extended a detention by ordering the defendant out of a vehicle after the traffic stop had concluded, conveying that a new custodial detention had begun. The present case is clearly different because no such coercive tactics

*(Footnote Continued Next Page)*

As the facts of the present case are more akin to those in **By** than in **Moyer**, we find that Appellant's traffic stop was immediately followed by a mere encounter with police. During that mere encounter, Appellant voluntarily consented to having his vehicle searched, as the record does not reflect that his consent was coerced by police conduct. Thus, the vehicle search was constitutionally valid, and the order denying Appellant's suppression motion must be upheld.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/25/2024

_____

were employed by police here. The facts of the present case are much closer to those in **By**, 812 A.2d at 1258, and **Randolph**, 151 A.3d at 177, where the police questioning following a traffic stop was found not to result in a resumption of the defendant's detention.

- 14 -