J-A01035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA　　:　IN THE SUPERIOR COURT OF
　　　　　　　　　　　　　　　　　:　　　　　PENNSYLVANIA
　　　　　　　　Appellant　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　v.　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
JENNIFER MARIE HALL　　　　　　 :　　No. 915 EDA 2023

Appeal from the Order Entered March 7, 2023
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0003484-2022

BEFORE: 　LAZARUS, P.J., PANELLA, P.J.E., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:　　　　　　**FILED DECEMBER 20, 2024**

The Commonwealth of Pennsylvania appeals from the order, entered in

the Court of Common Pleas of Lehigh County, granting Jennifer Marie Hall's

motion to suppress.[1]　After careful review, we affirm.

The trial court summarized the evidence from the suppression hearing

as follows:

> For purposes of the instant appeal, the underlying facts are not
> disputed. 　On April 19, 2022, Officer Kaila Balatgek of the
> Allentown Police Department was driving in a marked City of
> Allentown patrol vehicle dressed in full uniform. 　She was

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In accordance with Pa.R.A.P. 311(d), the Commonwealth certified that the suppression order has substantially handicapped its prosecution of the case. ***See Commonwealth v. Jones***, 69 A.3d 180, 185 (Pa. 2013) (Commonwealth's appeal of suppression order proper where Commonwealth certifies in good faith that order substantially handicaps prosecution).

conducting surveillance of a suspected narcotic location in the 300 block of Cedar Street, Allentown, Lehigh County, when she observed a female[,] later identified as [Hall,] enter the target location. [Hall] briefly remained inside and exited a few minutes later. Officer Balatgek observed [Hall] enter the front passenger seat of a green Buick sedan. Officer Balatgek noted that the driver's side window was partially covered with a black garbage bag.

Officer Balatgek conducted a motor vehicle stop at approximately 8:55 p.m. and approached the vehicle. She spoke with the driver, Jesse Craner, and [Hall] and asked for their identification. Neither [] Craner [n]or [Hall] had a driver's license. Officer Balatgek asked [Craner] to turn off the vehicle and remove the keys. She asked where they were coming from and [Hall] responded, "7th and Tilghman Street[s]." Officer Balatgek then told them she was aware they were not coming from 7th and Tilghman and advised them that she saw them parked in a back alley.

[Officer Balatgek] also told them that if they were honest with her, she would "help [them] out." Officer Balatgek noted, "I'm not worried about a few bags, I'm not worried about a few rocks, okay?" Neither [] Craner nor [Hall] were ***Mirandized***.[2] Officer Balatgek testified during the [suppression] hearing [] that at this time, neither Craner nor [Hall] were free to leave. While waiting for a back-up [police] unit to arrive, [Hall] asked Officer Balatgek what was going to happen, to which Balatgek replied, "Cooperation and honesty is best."

Once backup arrived, Officer Balatgek asked [] Craner to alight from the vehicle. When he was standing outside, she asked him how many bags he had on his person. He said he did not have any bags on his person, but implicated [Hall] by indicating she had two bags in her possession. [] Craner consented to a search and [Officer Balatgek] patted him down. She searched his pockets but did not find any narcotics. [] Craner also consented to a search of the vehicle. Officer Balatgek then approached [Hall] and asked, "Alright, honey. What do you got on you?" [Hall] replied, "It was just two bags." Officer Balatgek responded, "Just two bags? Okay, and where is it at?" [Hall] pulled two bags out from her shirt or

_____

[2] ***See Miranda v. Arizona,*** 384 U.S. 436 (1966).

> jacket and handed them over to [Officer] Balatgek.  The contents of the bags field tested positive for heroin.  [Hall] was not taken into custody at that time.  Both [Hall] and [] Craner were released at the scene.

Trial Court Opinion, 2-3 (citations omitted).[3]

Hall was arrested and charged with one count each of possession of a controlled substance[4] and possession of drug paraphernalia.[5]  On January 6, 2023, Hall filed a motion to suppress her statements as being the result of a custodial interrogation without the benefit of **Miranda** warnings.  Additionally, Hall challenged the admissibility of the packets of heroin as fruits of the poisonous tree.[6]  Hall contended that the police were not conducting a mere traffic stop, but rather a drug investigation, as Officer Balatgek's questions were specifically intended to elicit incriminating responses when Hall was under arrest and not provided her **Miranda** warnings.

On February 3, 2023, the trial court conducted a hearing, after which it took the matter under advisement.  On March 7, 2023, the trial court entered an order granting Hall's motion to suppress her statements and the

_____

[3] The dialogue quoted in the trial court opinion is from the officer's body camera video introduced into evidence as Commonwealth Exhibit C-1 and cited in support of the quotations.  We have reviewed the video evidence, as discussed **infra**, and conclude that the trial court's recitation is accurate.

[4] 35 P.S. § 780-113(a)(16).

[5] **Id.** at § 780-113(a)(32).

[6] "The 'fruit of the poisonous tree' doctrine prohibits the admission of evidence at trial that was tainted by unconstitutional actions by law enforcement officials."  **Commonwealth v. Santiago**, 209 A.3d 912, 914 (Pa. 2019).

subsequently-seized heroin. *See* Order, 3/7/23; *see also* Memorandum Opinion, 3/7/23, at 7.

On March 16, 2023, the Commonwealth filed a motion to reconsider and, on March 26, 2023, the trial court ordered argument and scheduled a hearing. On March 31, 2023, the trial court conducted the hearing, after which it took the matter under advisement. Later that same day, the Commonwealth filed a post-hearing submission. On April 6, 2023, the trial court denied the Commonwealth's motion to reconsider.

The Commonwealth filed a timely notice of appeal and presents the following claim for our review: "Did the trial court err in concluding that [Hall] was subjected to a custodial interrogation that required *Miranda* warnings where the totality of the circumstances clearly demonstrate that the interaction was an investigative detention?" Commonwealth's Brief, at 4.

On appeal from the grant of a suppression motion, we adhere to the following standard of review:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Richard*, 238 A.3d 522, 525 (Pa. Super. 2020) (citation omitted).

Our Supreme Court has explained the three levels of police encounters:

Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention[,]" must be supported by [] reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Ellis*, 662 A.2d 1043, 1047–48 (Pa. 1995) (citations omitted). Additionally, the Pennsylvania Supreme Court explained that "the term 'custodial detention' has generally been used by the United States Supreme Court to describe incidents in which the police do not verbally inform a suspect that [s]he is under arrest, but rather, undertake actions which result in the conditions of the detention becoming so coercive as to amount to the functional equivalent of a formal arrest." *Ellis*, 662 A.2d at 1048 n.3 (citation omitted).

Critical to our present inquiry, "*Miranda* warnings are required only when a suspect is in custody." *Commonwealth v. Pakacki,* 901 A.2d 983, 987 (Pa. 2006). "In order to trigger the safeguards of *Miranda,* there must be both custody and interrogation." *Commonwealth v. Heggins,* 809 A.2d 908, 914 (Pa. Super. 2002). In evaluating whether *Miranda* warnings were necessary, a court must consider the totality of the circumstances. *See Commonwealth v. Gaul*, 912 A.2d 252, 255 (Pa. 2006).

- 5 -

"The usual traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the conditions and duration of the detention become the functional equivalent of arrest." *Id*. at 202. "Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for *Miranda* purposes." *Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999) (en banc). Thus, "police need only give *Miranda* warnings while detaining a suspect by the side of a public highway when the suspect [has] actually [been] placed under arrest or when the questioning of the suspect is so prolonged or coercive as to approximate the atmosphere of a station house interrogation." *Commonwealth v. Toanone*, 553 A.2d 998, 1003 (Pa. Super. 1989).

"The fact that a police investigation has focused on a particular individual does **not** automatically trigger 'custody,' thus requiring *Miranda* warnings." *Mannion*, 725 A.2d at 200 (emphasis in original). However, an ordinary traffic stop may become custodial "when the stop involved coercive conditions, including, but not limited to, the suspect being forced into a patrol car and transported from the scene or being physically restrained." *Id*. at 202.

The factors a court uses to determine whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened, or used force;

and the investigative methods employed to confirm or dispel suspicions. ***Mannion***, 725 A.2d at 200; ***see also Commonwealth v. Williams***, 650 A.2d 420, 427 (Pa. 1994) (setting out factors to determine "whether a person is in custody for ***Miranda*** purposes"). "A reviewing court is to consider the particular facts of each case in order to determine whether a detention is custodial." ***Mannion***, 725 A.2d at 201.

Additionally, we must consider the impact the events had on the person being interrogated. ***See Commonwealth v. Seeney***, 316 A.3d 645, 649 (Pa. Super. 2024) (citation omitted) (emphasizing custodial interrogation analysis is dependent upon totality of circumstances with focus on suspect's perception). Indeed, whether a seizure is custodial in nature turns on "whether the suspect is physically deprived of [her] freedom in any significant way or is placed in a situation **in which** [**she**] **reasonably believes that** [**her**] **freedom of action or movement is restricted by said interrogation**." ***Commonwealth v. Gonzalez***, 546 A.2d 26, 29 (Pa. 1988) (emphasis added).

Instantly, Officer Balatgek's body camera recordings reveal that, once the stop commenced, she opened the driver's side door because the window was obstructed by a garbage bag, the purported basis for the stop. ***See*** Commonwealth Exhibit 1 (Officer Balatgek's Body Camera), at 20:55:20 – 20:55:41. Officer Balatgek then asked Craner and Hall for their licenses, registration, and proof of insurance. ***See id.*** at 20:55:44 – 20:55:46. Both occupants provided identification, along with the vehicle registration and proof

of insurance. ***See id.*** at 20:55:46 – 20:56:47. The officer also asked for the keys to the vehicle, which she took and placed upon the top of the stopped car. ***See id.*** at 22:55:35. The vehicle keys remained on top of the vehicle for the duration of the stop, and Officer Balatgek kept both occupants' IDs as well as the vehicle's insurance and registration for the entire stop. ***See id.***; ***see also*** Trial Court Opinion, 5/10/23, at 12.

Next, Officer Balatgek did **not** return to her vehicle to run the information or otherwise confirm vehicle ownership. ***See*** Commonwealth Exhibit 1 (Officer Balatgek's Body Camera). Rather, Officer Balatgek informed Craner and Hall that she believed they were lying to her, that they needed to be honest with her, and that they should tell her the truth about where they were and what they bought. ***See id.*** at 20:58:15 – 20:59:13. Officer Balatgek told them to "think about" being honest while she waited for backup police to arrive on scene. ***Id.*** at 20:59:13 – 24. On Officer Balatgek's body camera recording, she appears to pocket Craner's and Hall's IDs, as well as the vehicle registration and insurance cards. ***See id.***, at 21:00:34.

Shortly thereafter, another officer arrived on the scene in another marked police vehicle with its lights activated. ***See id.***, at 21:00:50. At that point, Officer Balatgek ordered Craner to exit the vehicle, ordered Hall to remain in the vehicle with her hands on the dashboard, and began questioning Craner separately. ***See id.***, at 21:00:55 – 21:01:08. The second officer stood outside of Hall's passenger-side door. ***See id.***, at 21:00:55 – 21:02:05. While questioning Craner, Officer Balatgek searched his pockets and asked him

whether he had purchased any drugs. *See id.*, at 21:01:10 – 21:02:05. Craner responded in the negative, but stated that Hall possessed drugs. *See id.* Officer Balatgek then swapped positions with the other officer, who went to speak with Craner, and Officer Balatgek, standing outside of the vehicle door, asked Hall "[a]lright honey, what do you got on you[?]" *Id.* at 21:02:05 – 16. Hall answered that she had "two bags," and Officer Balatgek continued to question her. *See id.*, at 21:02:16. Ultimately, Officer Balatgek searched Hall and the vehicle. *See id.* At no time during the interaction were *Miranda* warnings issued.

Relevantly, this Court recently addressed the influence that an officer's retention of a defendant's identification documentation can have on the court's constitutional analysis when evaluating the totality of the circumstances. *See Commonwealth v. Ochoa*, 304 A.3d 390 (Pa. Super. 2023). In *Ochoa*, the defendant was investigated for suspicion of driving under the influence. *See id.* During the vehicle stop, the defendant provided his driver's license to police, who retained it for the duration of the stop. *See id.* at 399-400. This Court concluded that, while the stop itself was lawful and supported by reasonable suspicion, the defendant's subsequent "consent" to search his vehicle was tainted because the police still possessed his driver's license. *See id.* (citing *Commonwealth v. Mattis*, 252 A.3d 650 (Pa. Super. 2021) and *Commonwealth v. Lopez*, 609 A.2d 177 (Pa. Super. 1992)). In particular, this Court concluded that the defendant did not feel free to leave because, by retaining his driver's license, "the police created a legal impediment to

[defendant]'s ability to leave the scene of the traffic stop." ***Ochoa***, 304 A.3d at 399.

We note that ***Ochoa*** does not speak directly to whether an investigative detention rises to the level of a custodial interrogation merely by the retention of a defendant's driver's license. Nevertheless, we rely on ***Ochoa*** for the proposition that police retaining a defendant's driver's license or identification **is a significant factor** to consider when determining whether a reasonable person would feel free to leave. Furthermore, as our Supreme Court noted in ***Commonwealth v. Cost***, 224 A.3d 641 (Pa. 2020), "the retention by police of an identification card . . . will generally be a material and substantial **escalating factor within the totality assessment**." ***Id.*** at 651 (emphasis added).

Here, the trial court properly considered the facts and relevant circumstances and determined that Hall reasonably believed that her freedom of action and movement was restricted by the officer's interrogation. ***See*** Trial Court Opinion, 5/10/23, at 5-13. Indeed, the trial court relied upon Officer Balatgek's vehicle and body camera footage in making its determination. ***See id.*** The trial court emphasized that the record supported the fact that Officer Balatgek **had Hall's and her co-defendant's IDs and the vehicle's registration and insurance documents**. ***See*** Trial Court Opinion, 5/10/23, at 12 ("Officer Balatgek had confiscated [Hall']s identification and advised [Hall] . . . [that] she suspected them of buying illegal drugs."); ***see also*** N.T. Suppression Hearing, 2/3/23, at 20 (Officer

Balatgek testifying she did not return IDs or vehicle documentation until end of police encounter); *id.* at 22 (Officer Balatgek testifying Hall was not free to leave). Additionally, the trial court noted that Officer Balatgek had ordered Craner to turn off the vehicle and placed the keys on the roof of the vehicle. *See* Trial Court Opinion, 5/10/23, at 12. Then, after back up arrived and another officer positioned himself outside of Hall's passenger-side door, Officer Balatgek questioned Craner, who informed Officer Balatgek that Hall possessed narcotics. *See id.* The trial court concluded that "an objective review of those facts would lead a person in [Hall]'s position to believe she was not free to leave and that she was being asked questions intending to elicit incriminating information from her." *Id.*

In light of the foregoing, we conclude that the trial court's factual determinations are supported by the record and that its legal conclusions are sound.[7] *See* Trial Court Opinion, 5/10/23, at 5-13; *see also Richard*, *supra*; *Ochoa*, *supra*; *Cost*, *supra*. The trial court properly suppressed Hall's statements and the subsequently-acquired heroin as she was subject to custodial interrogation without the benefit of *Miranda* warnings. Accordingly, we affirm the trial court's order granting Hall's motion to suppress.

_____

[7] Moreover, we observe that Hall was not transported to the police station or placed into a police cruiser. *See Mannion*, *supra*. Nevertheless, this is not dispositive of the issue before us because transportation of a defendant is but **one factor** that we must consider in addressing the totality of the circumstances surrounding the interaction. *See Gaul*, *supra*; *Seeney*, *supra*.

Order affirmed.

Panella, P.J.E., Joins the Memorandum.

Colins, J., Files a Dissenting Memorandum.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/20/2024